**FIRST NATIONWIDE BANK, A Federal Savings Bank, Plaintiff,**

v.

**NATIONWIDE SAVINGS AND LOAN ASSOCIATION a/k/a West Helena Savings and Loan Association, Defendant.**

No. LR–C–589.

United States District Court,
E.D. Arkansas, W.D.

Feb. 17, 1988.

As Amended Feb. 23, 1988.

Herbert C. Rule, III, Hillary Rodham Clinton, David L. Williams, Rose Law Firm, Little Rock, Ark., for plaintiff; David H.T. Kane, Siegrun D. Kane, Kane, Dalsimer, Sullivan Firm, New York City, of counsel.

Peter J. Thurston, Gibson, Dunn & Crutcher, San Jose, Cal., Hermann Ivester, Ivester, Henry, Skinner & Camp, Little Rock, Ark., for defendant.

## AMENDED ORDER

GEORGE HOWARD, Jr., District Judge.

This action was initiated by First Nationwide Bank, a Federal Savings Bank (plaintiff) against Nationwide Savings and Loan Association, a/k/a West Helena Savings and Loan Association (defendant). This Court's jurisdiction is invoked, among other things, pursuant to Title 15 U.S.C. Sections 1114, 1125(a) *et seq.*, also known as the Lanham Act.

Jurisdiction is also invoked pursuant to Arkansas' Trademark and Labels Act, Ark. Stat. 70–550 *et seq.*, and applicable common law rights. In essence, plaintiff alleges infringement of Federally Registered Marks, unfair competition and dilution of distinctive quality of plaintiff's name, reputation, goodwill and marks.

Plaintiff has requested an injunction against Defendant's use of *"Nationwide Savings"*.

OBSERVATIONS REGARDING BURDEN OF PROOF AND PRESUMPTION OF VALIDITY OF REGISTERED MARK

■ As a general rule, in order to establish a trademark infringement under the Lanham Act, plaintiff must prove, by a preponderance of the evidence, a likelihood of confusion resulting from a purported infringing mark. Seemingly, proving wrongful intent on the part of defendant is not a prerequisite. However, if the evidence proffered by plaintiff discloses that defendant has adopted the alleged infringing mark with intent to benefit from the confusion created by profiting on plaintiff's reputation and goodwill, "the inference that a likelihood of confusion would arise is inescapable"[,] *Truck Equipment Service Co. v. Fruehauf Corporation*, 536 F.2d 1210 (8th Cir.1976), and the defendant, the alleged infringer, has the burden of going forward with proof, demonstrating an absence of confusion. See also: *HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 720 (9th Cir.1974); *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin–Lecoultre Watches, Inc.*, 221 F.2d 464, 467 (2nd Cir.1955); *My–T–Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2nd Cir.1934).

■ Registration of a trademark is prima facie evidence of the registrant's right to use the mark exclusively in commerce as well as an indicia of ownership of the mark. See: 15 U.S.C. § 1115(a); *Curtis–Stephens–Emby Co. v. Pro–Tek–Toe Skate Stop Co.*, 199 F.2d 407 (8th Cir.1952). Also, registration of a mark establishes a rebuttable presumption of validity and regularity of registration. *Miss Universe, Inc. v. Patricelli*, 408 F.2d 506 (2nd Cir. 1969).

■ A defendant who asserts that a registration is invalid because of fraud has the burden of demonstrating that facts set forth in the applicant's affidavit were false and the affidavit fraudulent. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2nd Cir.1976).

For reasons discussed hereafter, the Court holds that plaintiff is entitled to the relief requested.

## FINDINGS OF FACT

1. Plaintiff, First Nationwide Bank, A Federal Savings Bank, formerly First Nationwide Savings, is a federally chartered savings and loan association, with its principal office and place of business at 706 Mission Street, San Francisco, California 94103. It provides savings, checking investments, consumer loans and real estate mortgages to over a million American families and individuals. Plaintiff is among the nation's largest savings and loan institutions, with assets of over 15 billion dollars.

2. Defendant is an Arkansas chartered savings and loan association, with a place of business at 400 Plaza Street, West Helena, Arkansas 72390, and is doing business in Pulaski County, Arkansas. However, its savings and loan business encompasses transactions with patrons in approximately thirty-nine (39) states and the District of Columbia.

3. Plaintiff has used the marks First Nationwide Savings since 1982 and 1st Nationwide Network since 1983, and holds federal registrations for these marks. Moreover, plaintiff is the owner of the following registrations in the United States Patent and Trademark Office:

| MARK | FILING DATE | REG. DATE | REG. NO. |
|---|---|---|---|
| 1ST NATIONWIDE SAVINGS AND DESIGN | 03/08/82 | 10/11/83 | 1,253,930 |
| FIRST NATIONWIDE SAVINGS | 06/20/85 | 08/12/86 | 1,405,237 |
| 1ST NATIONWIDE SAVINGS | 06/20/85 | 08/12/86 | 1,405,238 |
| 1ST NATIONWIDE SAVINGS AND DESIGN | 06/20/85 | 08/12/86 | 1,405,239 |
| 1ST NATIONWIDE NETWORK | 06/20/85 | 08/19/86 | 1,406,071 |
| 1ST NATIONWIDE NETWORK AND DESIGN | 01/20/85 | 10/28/86 | 1,415,232 |

These registrations are prima facie evidence of the validity of plaintiff's marks, plaintiff's ownership of the marks and plaintiff's exclusive right to use of these marks for the services covered.

4. First Nationwide's services are geared toward today's mobile population. First Nationwide customers and potential customers who are traveling, relocating or retiring are urged to look for First Nationwide branches and services in other parts of the country.

5. Plaintiff has been engaged in the savings and loan business for over 100 years. In 1885, First Nationwide's predecessor, Citizens Savings and Loan Association, was founded in California. In September, 1981, Citizens Savings and Loan merged with Washington Savings and Loan of Miami Beach, Florida, and West Side Federal Savings and Loan of New York.

6. In late 1981, plaintiff selected a new name to identify its organization: First Nationwide Savings. By the end of 1983, plaintiff operated approximately 150 First Nationwide Savings branch offices in California, New York and Florida.

7. In 1983, plaintiff began a program of opening 1st Nationwide's Savings branches at retail premises—first at J.C. Penney, and then at K–Mart. At the time of trial there were 150 1st Nationwide branches in six states across the country.

8. In December, 1985, First Nationwide was acquired by Ford Motor Company. By the end of 1985, plaintiff operated 180 First Nationwide Savings branches in California, New York, Florida and Hawaii.

9. On June 28, 1986, plaintiff changed its name from First Nationwide Savings, A Federal Savings and Loan Association, to First Nationwide Bank, A Federal Savings Bank.

10. The consumer is still exposed to the name First Nationwide Savings used to identify plaintiff on materials such as passbooks, mortgage documents and certificates of deposit, as well as occasional press references to First Nationwide Savings.

11. In December, 1986, plaintiff acquired St. Louis Federal Savings and Loan

and began operating its twenty-five (25) locations in Missouri as First Nationwide branches.

12. As of December, 1987, plaintiff had 350 branches in thirteen (13) states. Plaintiff has received regulatory authority to open First Nationwide branches in two more states. In 1983, 1st Nationwide Network was formed. It is a subsidiary of plaintiff's parent, First Nationwide Financial Corporation and is licensed by plaintiff to use the name and mark 1st Nationwide Network.

13. 1st Nationwide Network provides a number of products and services to its member banking institutions, among other things, asset and liability management, earnings improvement studies, financing programs, lending services, non-earning asset liquidation assistance, national advertising services, and access to a system-wide shared automated teller machine network.

14. 1st Nationwide Network services and products provided by 1st Nationwide Network members to the consumer include: IRA funds and retirement services, special senior citizen services, and a national check cashing program that allows a customer of any 1st Nationwide Network to cash a check at any of the over 600 branches across the United States.

15. 1st Nationwide Network members identify and advertise their institutions to the public as members of the 1st Nationwide Network. The 1st Nationwide Network mark appears on materials distributed to the public as check cashing cards, deposit and withdrawal slips, business cards, stationery and mailing labels.

16. 1st Nationwide Network has rapidly expanded. 1st Nationwide Network signed on its first member, St. Louis Federal Savings and Loan, in Missouri in September, 1983.

17. By the end of 1985, 1st Nationwide Network had over twenty-two member institutions with over 440 1st Nationwide Network branches in twenty states. Three of these states, Missouri, Tennessee and Oklahoma, border on Arkansas.

18. By the end of 1986, 1st Nationwide Network had over forty member institutions with over 580 1st nationwide Network branches in thirty-three states.

19. The combined assets of 1st Nationwide Network members at the end of 1986 totaled nearly 35 billion dollars.

20. As of September 1, 1987, 1st Nationwide Network had forty-seven member institutions with over 670 branches in thirty-seven (37) states, including five states that border on Arkansas.

21. Close to 100 million dollars has been invested in advertising and promoting 1st Nationwide Savings, 1st Nationwide Network, and recently 1st Nationwide Bank throughout the United States from 1982 through 1987.

22. From 1983 to 1985, an estimated 10 million dollars was spent by 1st Nationwide Network members (other than plaintiff) in advertising and promotion which included the 1st Nationwide Network mark.

23. From 1986 to June, 1987, 1st Nationwide Network members (other than plaintiff) spent an estimated 5.5 million dollars in advertising and promotion which included the 1st Nationwide Network mark.

24. Advertising featuring 1st Nationwide banking services have appeared in national magazines such as: Time, Newsweek, Life, National Geographic, People, Reader's Digest, TV Guide, Financial Planning Magazine, American Banker, U.S. Banker and Savings Institutions.

25. Major newspaper carrying 1st Nationwide advertisements include: The Wall Street Journal, The New York Times, Crain's New York Business, USA Today, Los Angeles Times, San Francisco Chronicle/Examiner, Miami Herald.

26. Local newspapers carry advertising for First Nationwide and 1st Nationwide Network branches all around the country.

27. Television advertising for 1st Nationwide Network includes prime time network shows, e.g., the 1986 Super Bowl, The Cosby Show and Cable TV.

28. Public exposure to First Nationwide also occurs as a result of the prominent use of the name on bank buildings and signs

located in cities and malls with large consumer traffic.

29. Since 1982, accounts served by plaintiff First Nationwide have more than doubled, from approximately 700,000 accounts in 1982, to approximately 2 million in 1987.

30. Accounts served by 1st Nationwide Network members, exclusive of plaintiff, have increased from approximately 300,000 accounts in 1983 to approximately 1.5 million in 1987.

31. Savings inflow to plaintiff First Nationwide in 1982 was 116 million dollars; savings inflow for 1986 totaled over 2.3 billion dollars.

32. Total lending volume by plaintiff First Nationwide increased from 470 million dollars in 1982, to over 5 billion dollars for 1986.

33. First Nationwide's reputation has extended to Arkansas through national advertising and publicity as well as through direct efforts to solicit 1st Nationwide Network members in Arkansas.

34. 1st Nationwide Network solicitation efforts in Arkansas have involved contacts with numerous Arkansas banking institutions. These contacts include visits to Arkansas banks, attendance at conferences and seminars directed to banking institutions, presentation of seminars by 1st Nationwide Network for members and prospective members at its Atlanta, Georgia, headquarters, phone calls, correspondence, and promotional literature.

35. Defendant was chartered under the name West Helena Savings and Loan Association. Defendant began operating in 1978 under the name West Helena Savings and Loan.

36. In 1985, West Helena Savings and Loan was purchased for approximately $750,000 by Del Chandler, David Siegel and Warren Halperin. The new owners took control at the board meeting of October, 1985.

37. Defendant concedes that it had prior knowledge of plaintiff.

38. Del Chandler and David Siegel knew of 1st Nationwide Savings prior to defendant's adoption of Nationwide Savings. Del Chandler had seen TV or print advertising for 1st Nationwide Savings. Del Chandler read about Ford's acquisition of First Nationwide Savings in 1985. David Siegel knew about 1st Nationwide Savings since around 1982.

39. Del Chandler and David Siegel knew of 1st Nationwide Network prior to defendant's adoption of Nationwide Savings.

40. Del Chandler was aware that First Nationwide along with other major savings and loans had a reputation for expansion.

41. David Siegel was aware of First Nationwide's good reputation in the savings and loan industry.

42. Before defendant adopted or chose Nationwide Savings, defendant considered the following other names: (1) Empire, (2) American and (3) National.

43. Defendant did not adopt Empire because there had been an Empire Savings and Loan in Texas with serious financial problems and the Empire name had a negative connotation.

44. Defendant did not choose American because there was already a large number of financial institutions using American.

45. Defendant searched the index of the names of all savings and loan institutions in regional directories to determine if any other financial institutions used "Nationwide" or a similar name. Defendant found none.

46. Defendant searched the Arkansas Section of the 1985 U.S. Savings League Directory. Plaintiff's advertisement for 1st Nationwide Network appeared in that directory on the page facing the listing for Arkansas savings and loan associations.

47. Defendant chose the name Nationwide because it did not find the name in regional directories.

48. Defendant's President, Mr. Sly, testified that if another Nationwide Savings & Loan had appeared in the regional directory defendant would probably not have chosen the name Nationwide.

49. Del Chandler checked the states where 1st Nationwide was operating to see if they had reciprocal agreements that allowed 1st Nationwide to do banking in Arkansas.

50. Del Chandler discussed possible conflict between Nationwide Savings and 1st Nationwide Savings with David Siegel before defendant's name change.

51. Defendant did not obtain a legal opinion as to the availability of the name Nationwide Savings.

52. Defendant did not conduct any search of Patent and Trademark Office records prior to adopting Nationwide Savings.

53. The first written reference to defendant's consideration of the name Nationwide appears in defendant's Board of Directors' minutes dated February 18, 1986.

54. Defendant's President, Mr. Sly, testified that he first discussed the name Nationwide with defendant's Chairman, Mr. Chandler, in February, 1986.

55. In May, 1986, defendant filed papers to change its name to Nationwide Savings and Loan with the Arkansas Savings and Loan Association Board.

56. Defendant's first use of the name Nationwide did not take place until the end of July, 1986.

57. In connection with the name change proceedings in July, 1986, defendant's Chairman, Del Chandler, testified before the Arkansas Savings and Loan Board.

58. In response to the Supervisor's question as to the reason for defendant's name change, defendant's Chairman testified that he chose the name Nationwide because of plaintiff's good reputation. Defendant's Chairman stated:

"This was one name that depicted a very good rapport. There's only one other Nationwide, that First Nationwide located in San Francisco, and they were very pleased and honored that we even chose their name based on their good reputation, or a facsimile thereof."

59. Defendant's trial testimony that plaintiff had no reputation, that defendant was not trying to trade on plaintiff's reputation and that there is no confusion because plaintiff offers no banking services in Arkansas is contradicted by defendant's trial testimony that "as big as" plaintiff is, its activities will make national press and Arkansas is not in a vacuum.

60. Defendant's trial testimony that it chose the name Nationwide because this name was "virtually unknown" and had a neutral or no reputation is not credible.

61. Defendant's bad faith is further shown by defendant's misleading suggestion to the Arkansas Savings and Loan Board that plaintiff approved defendant's use of the name Nationwide. Thus defendant stated to the Board that First Nationwide was "pleased and honored that we even chose their name based on their good reputation".

62. Defendant's Arkansas Savings and Loan Board testimony that plaintiff was "pleased and honored" that defendant chose First Nationwide's name based on First Nationwide's good reputation: falsely suggested that First Nationwide approved defendant's use of the name Nationwide.

63. While still using West Helena to identify its West Helena premises, defendant began using Nationwide Savings in connection with the "money desk" it operated in Santa Ana, California. The money desk involves calls by a single Nationwide Savings employee to savings and loans and other customers all around the country to purchase funds with interest payments offered at certain rates. The name Nationwide Savings is used to identify the soliciting organization.

64. Defendant uses the name Nationwide Savings & Loan on the stationery of its mortgage loan subsidiary Bayhill as a marketing aid. Defendant asserts that this use gives customers a feeling of confidence to know that a mortgage company is owned by a savings and loan institution.

65. Defendant uses the name Nationwide Savings & Loan on stationery and business cards for its officers conducting business from Santa Ana, California.

66. The majority of defendant's deposits are raised by its money desk in Santa Ana, California. Defendant has done no advertising for its money desk operation, although defendant's competitors do advertise in The Wall Street Journal.

67. Defendant's President testified at trial that the money desk which had been operated from California was being moved to Arkansas.

68. Defendant's Chairman testified that defendant had closed its money desk and had no immediate plans to re-open it.

69. Whatever the status of defendant's money desk, plaintiff and defendant have account holders in the same states.

70. Defendant's assets have more than quadrupled since control was acquired by Chandler/Siegel/Halperin in 1985.

71. Plaintiff saw a reference to Nationwide Savings in The Wall Street Journal, dated November 6, 1986, and notified defendant of infringement by letter dated November 11, 1986.

72. From November, 1986, to August, 1987, the parties pursued settlement. During this period:

(a) Plaintiff determined that defendant was continuing to use West Helena Savings & Loan to identify its West Helena premises.

(b) Defendant did not reveal its money desk operation or its plans to open a second branch in Little Rock to plaintiff. Notice of defendant's second branch only came to plaintiff's attention through an August, 1987, Arkansas newspaper article. This action was filed on August 27, 1987.

73. Defendant's use of Nationwide Savings has generated or caused actual confusion.

74. James Coles, formerly Vice Chairman of First Federal of Arkansas, testified that he had seen an advertisement for Nationwide Savings in the fall of 1986.

75. Since the spring of 1985, Mr. Coles had been considering his bank's possible membership in 1st Nationwide Network with a representative of 1st Nationwide Network, Steve Barbee.

76. Mr. Coles had also seen national advertising for 1st Nationwide Network in Arkansas, e.g., in Time Magazine and on television sports.

77. Mr. Coles' reaction to defendant's advertisement was that Nationwide Savings must in some way be affiliated with First Nationwide Bank.

78. After reflecting on defendant's ad, Mr. Coles assumed defendant was not a branch of First Nationwide Bank, but that defendant was affiliated with 1st Nationwide Network.

79. Mr. Coles discovered that he was mistaken in his assumption that there was some connection between Nationwide Savings and First Nationwide in a conversation with Steve Barbee of 1st Nationwide Network.

80. Preston Grace, Jr. also testified as to his confusion resulting from defendant's use of the name Nationwide Savings and Loan.

81. Mr. Grace is Chairman of the Board of Independence Federal Bank with twenty-three (23) branches located primarily in northern Arkansas, including Little Rock and Hot Springs.

82. Mr. Grace saw a reference to Nationwide Savings and Loan around the fall of 1986, at about the same time that he had received information from 1st Nationwide Network. Mr. Grace had answered an advertisement of 1st Nationwide Network.

83. Upon seeing the reference to Nationwide Savings and Loan, Mr. Grace's impression was that they were a member of 1st Nationwide Network.

84. Mr. Grace advised the representative of 1st Nationwide Network, Mr. Barbee, that he was hesitant to pursue membership in 1st Nationwide Network because Mr. Grace thought there already was a 1st Nationwide Network member in Arkansas.

85. After Mr. Grace was advised that Nationwide Savings was not a 1st Nationwide Network member, Mr. Grace was still reluctant to pursue membership with 1st Nationwide Network because of the possibility of confusion between the similar

names Nationwide Savings and Loan Association and 1st Nationwide Bank or 1st Nationwide Network.

86. Claudia Koons, a representative of 1st Nationwide Network, had a discussion with a prospective member of 1st Nationwide Network in Arkansas concerning that member's confusion between Nationwide Savings and plaintiff. Ms. Koons could not recall the name of the individual with whom she had this discussion.

87. Plaintiff's Chairman, Tony Frank, personally experienced confusion with defendant's name in connection with a November 11, 1987, Wall Street Journal article. This article quoted a representative of Nationwide Savings and Loan as stating that its flow of loan applications "just completely shut off" in the first few days after the market crash.

88. Mr. Frank received a telephone call from a reported from the CBS morning television news and advised the reporter that it was not Mr. Frank's institution that made the statement referred to in The Wall Street Journal article.

89. Plaintiff's expert, James Coles, served as President of the Federal Home Loan Bank (FHLB) Ninth District during the years 1972 to 1978.

90. Mr. Coles' experience in the banking field also included his positions as Vice Chairman of First Federal of Arkansas, Chief Executive and President of United Financial, a statewide savings and loan in Houston, Texas, and Chief Executive and President of Imperial Corporation, a four-state savings and loan holding company.

91. During Mr. Coles' tenure with the FHLB, the FHLB reviewed proposed names for federally chartered savings and loan institutions to determine if the proposed names might cause confusion or deception with existing names.

92. During this period Mr. Coles participated in the review and determination of issues of confusion between proposed names and existing names for federally chartered savings and loan associations.

93. Mr. Coles testified that in his opinion defendant's use of Nationwide Savings and Loan Association was likely to cause public confusion with plaintiff.

94. Mr. Coles' opinion, based on his experience as President of the FHLB, and his experience as an executive officer of banking institutions in Arkansas, Texas and four other states, is entitled to considerable weight.

95. The evidence of secondary meaning filed by plaintiff in the United States Patent and Trademark Office, including statements as to plaintiff's assets, number and location of branches, savings inflow, lending volume, numbers of customers, sample magazines and newspapers carrying plaintiff's advertising is accurate.

96. The consumer awareness survey report prepared by plaintiff's advertising agency in June, 1986, suggests that a significant percent of the population in Albuquerque, San Francisco and New York is aware of plaintiff's mark.

97. Corporate records from 1982 and 1985 confirm the advertising expense totals reported to the United States Patent and Trademark Office in February and March, 1986.

98. Testimony by plaintiff's witnesses confirms the advertising expense totals reported to the United States Patent and Trademark Office in February and March, 1986.

99. Plaintiff's representations to the United States Patent and Trademark Office concerning advertising expenditures for the year 1982 through 1984 are not materially misleading as asserted by defendant.

100. Out of over three thousand savings and loan associations around the country, only two, plaintiff and defendant, use the name Nationwide.

101. Before defendant adopted the name Nationwide Savings, defendant's Chairman was aware that there was only one other Nationwide, namely, First Nationwide.

102. None of the third party references to Nationwide introduced by defendant show Nationwide as the name of a savings and loan or bank.

103. Defendant offered no proof at trial regarding the extent of its investment in the name Nationwide. Defendant's Chairman merely made conclusory statements that it was costly to defend this suit; that it was unfair, and that an injunction would create havoc in terms of defendant's entry into the Little Rock marketplace.

104. Defendant's entire Little Rock operation was undertaken with knowledge of plaintiff's objection to defendant's use of Nationwide.

105. Defendant sought permission from Arkansas authorities to open its Little Rock branch in July, 1987, eight months after defendant received plaintiff's notice of infringement.

106. Defendant began accepting loan applications at its Little Rock premises in October, 1987, after this suit and plaintiff's motion for preliminary injunction were filed.

107. Defendant's Little Rock premises had no permanent signs in September and October, 1987.

108. Defendant did not open its Little Rock premises for the acceptance of deposits until November, 1987.

109. Since defendant began accepting deposits in Little Rock in November, 1987, it has accumulated $2 million in deposits.

110. Defendant's public use, advertising and business activities under the name Nationwide Savings in Little Rock were all undertaken after the filing of this suit on August 27, 1987.

111. Substantially all of defendant's use of Nationwide Savings in association with its West Helena branch were undertaken with knowledge of plaintiff's objection to defendant's use of Nationwide.

112. Only a few local newspaper ads referring to defendant as both West Helena Savings and Loan and Nationwide Savings and Loan were run in July–August, 1986.

113. Between August, 1986, and April, 1987, all of defendant's advertising referred to defendant jointly as West Helena Savings and Loan and Nationwide Savings and Loan.

114. From April, 1987, to October, 1987, defendant's advertising referred to defendant jointly as West Helena Savings and Loan and Nationwide Savings and Loan.

115. From the time that plaintiff objected to defendant's use of Nationwide in November, 1987, through the trial of this action, the permanent exterior signs for defendant's West Helena premises identified defendant as West Helena Savings and Loan without any reference to the name Nationwide.

116. Temporary signs on the doors of defendant's West Helena premises referring to Nationwide Savings and Loan were not displayed until sometime in November, 1987.

117. Defendant's continued prominent use of West Helena Savings and Loan in advertising through October, 1987, and on exterior signage through trial of this action should facilitate defendant's continued operation under the name West Helena Savings and Loan.

118. Plaintiff, unlike many other savings and loans, has made a profit in every year of its over 100 year existence.

119. Consumer confidence in this country's financial system and specific institutions in particular is delicate.

120. Dependability of a financial institution is an important factor to the consumer.

121. Adverse publicity about Nationwide Savings could affect plaintiff very directly in terms of consumer confidence.

122. Plaintiff's Chairman has already found it necessary to advise a CBS reporter that statements by defendant about declining loan applications quoted in a Wall Street Journal article were not statements made by plaintiff's institution.

123. Defendant's use of the name Nationwide has caused confusion with respect to 1st Nationwide Network's solicitation of at least two prospective 1st Nationwide Network members in Arkansas.

124. An existing 1st Nationwide Network member, New Mexico Federal Savings and Loan, has testified to concern over

defendant's use of Nationwide for several reasons:

(a) Defendant will obtain the benefits of advertising for 1st Nationwide Network when defendant has not contributed to that advertising.

(b) Customers of New Mexico Federal Savings and Loan could read about Nationwide Savings in the public press and believe that 1st Nationwide Bank or 1st Nationwide Network was the subject of the article.

(c) New Mexico Federal customers traveling through Arkansas might seek to obtain the national check cashing privileges offered by 1st Nationwide Network members from defendant, believing that defendant was a member of 1st Nationwide Network. If that service was not available, it would reflect unfavorably on New Mexico Federal.

125. The risk of damage to plaintiff's reputation built up over a hundred year history of successful, conservative operations and of damage to plaintiff's 1st Nationwide Network program from defendant's confusing use of the name Nationwide warrants the granting of the injunctive relief.

126. This Court is persuaded that defendant intended to profit or exploit plaintiff's good will and positive reputation, thus the inference of likelihood of confusion is drawn and, as such, the burden of going forward shifted to defendant to show that there has been no likelihood of confusion; that defendant has failed to overcome the inference of the likelihood of customer confusion.

127. That plaintiff has not relied exclusively on the inference of the likelihood of confusion created and the failure of defendant to demonstrate an absence of confusion, but, on the contrary, plaintiff has affirmatively offered evidence to establish, by a preponderance of the evidence, that confusion exists from the infringement of the mark by defendant.

128. Defendant's counterclaim seeking damages and asking for a declaratory judgment invalidating plaintiff's service mark registrations and an order cancelling registration of plaintiff's registration numbers 1,253,930; 1,288,505; 1,405,237; 1,405,239; 1,406,071 and 1,415,232 is without merit and should be dismissed with prejudice.

The following Conclusions of Law, insofar as they may be considered Findings of Fact, are so found by this Court to be true in all respects:

1. This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1332 and 1338.

2. The Court, on its own motion, in accordance with Fed.R.Civ.P. 65(a)(2) advanced and consolidated plaintiff's request for preliminary injunction with a final hearing on the merits.

3. Plaintiff owns the following registrations in the United Patent and Trademark Office:

| MARK | FILING DATE | REG. DATE | REG. NO. |
|---|---|---|---|
| 1ST NATIONWIDE SAVINGS AND DESIGN | 03/08/82 | 10/11/83 | 1,253,930 |
| FIRST NATIONWIDE SAVINGS | 06/20/85 | 08/12/86 | 1,405,237 |
| 1ST NATIONWIDE SAVINGS | 06/20/85 | 08/12/86 | 1,405,238 |
| 1ST NATIONWIDE SAVINGS AND DESIGN | 06/20/85 | 08/12/86 | 1,405,239 |
| 1ST NATIONWIDE NETWORK | 06/20/85 | 08/19/86 | 1,406,071 |
| 1ST NATIONWIDE NETWORK AND DESIGN | 06/20/85 | 10/28/86 | 1,415,232 |

These registrations are *prima facie* evidence of the validity of plaintiff's marks, plaintiff's ownership of the marks and plaintiff's exclusive right to use these marks for the services covered.

4. A descriptive mark is protectable when it has come to identify a single com-

pany. This association with a single source is known as secondary meaning. The name Nationwide has been held to be a descriptive mark that is capable of protection upon proof of secondary meaning. *Nationwide Mutual Insurance Co. v. First Nationwide Savings*, 221 U.S.P.Q. 686, 690 (S.D. N.Y.1982).

5. Plaintiff's federal registrations are presumptive evidence of secondary meaning for its 1st Nationwide marks on banking services. *Iowa Farmers Union v. Farmers' Educational & Coop U.*, 247 F.2d 809, 817 (8th Cir.1957).

6. All of plaintiff's registrations for the word marks First Nationwide Savings and First Nationwide Network were passed to publication before defendant's first use.

7. Defendant's claim that plaintiff sought its 1986 word mark registrations only after defendant adopted Nationwide is erroneous. Plaintiff filed for these registrations on June 20, 1985, a year before defendant made any use of Nationwide. The issue of secondary meaning was decided by the Patent and Trademark Office and notices of allowance were issued in April and May, 1986, several months before defendant made any use of Nationwide.

8. Although plaintiff benefits from a presumption created by plaintiff's registrations, nevertheless, plaintiff has proven secondary meaning as a result of its common law use.

9. Trademark rights depend on use. Use of a mark likely to cause confusion may be enjoined on the basis of prior use. A registration is not required to enjoin use of an infringing mark. *West & Company, Inc. v. Arica Institute, Inc.*, 194 U.S.P.Q. 32, 36 n. 14 (S.D.N.Y.1976), *aff'd*, 557 F.2d 338 (2nd Cir.1977).

10. A weak mark, through extensive use, advertising and sales can become strong. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 n. 13 (11th Cir.1983).

11. As a result of plaintiff's exclusive use, substantial advertising and sales, plaintiff's 1st Nationwide marks have acquired secondary meaning. *American Sci-*

*entific Chemical v. American Hospital Supply*, 690 F.2d 791, 793 (9th Cir.1982). Plaintiff's extensive publicity and customer dealings are further evidence of secondary meaning. *Scarves by Vera, Inc. v. Todo Imports Ltd. (INC.)*, 544 F.2d 1167, 1173 (2nd Cir.1976).

12. Defendant's adoption of Nationwide Savings with knowledge of plaintiff's use of 1st Nationwide Savings establishes an inference of secondary meaning. *Truck Equipment Service Company v. Fruehauf Corporation*, 536 F.2d 1210, 1220 n. 13 (8th Cir.1976).

13. Defendant has stated that it chose the name Nationwide because of First Nationwide's good reputation in the banking field. Defendant's attempt to capitalize on plaintiff's reputation is significant evidence of First Nationwide's secondary meaning. *Harlequin Enterprises Ltd. v. Gulf & Western Corporation*, 644 F.2d 946, 950 (2nd Cir.1981).

14. In addition, the evidence of actual confusion is an indication that plaintiff's First Nationwide marks have acquired secondary meaning. *American Scientific, supra*, 690 F.2d at 793.

15. To succeed on its claims of violation of the Lanham Act and common law unfair competition, plaintiff must prove that defendant's use of "Nationwide Savings" "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1); *See, SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1090–91 (8th Cir.1980).

16. Likelihood of confusion exists where the trade or public are likely to believe that defendant's Nationwide Savings is somehow associated with plaintiff First Nationwide, e.g., defendant's services are sponsored or authorized by plaintiff or defendant is a member of plaintiff's 1st Nationwide Network. *Charles Schwab & Co. v. Hibernia Bank*, 665 F.Supp. 800, 803 (N.D.Ca.1987).

Defendant's choice of Nationwide Savings with knowledge of 1st Nationwide Savings and after over 56 million dollars had been expended in advertising 1st Nationwide Savings alone also raises "an in-

ference ... of an intent to cause confusion." *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545–46 (11th Cir. 1984).

17. As a general rule, the plaintiff in an action for trademark infringement is not required to prove the defendant's intent. However, where intention to exploit its good will has been shown, the inference of likelihood of confusion is readily drawn because the alleged infringer has indicated by its actions an expectation that such confusion will indeed be created. In effect, such a finding shifts the burden to the defendant to show that its efforts have proven unsuccessful. *HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 720 (9th Cir.1974). See also, *My–T–Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2nd Cir.1934).

The Court finds that defendant has failed to show that there has been no likelihood of confusion and has not overcome the inference that its use of the disputed mark is likely to cause customer confusion. *Wendy's International, Inc. v. Big Bite, Inc.*, 576 F.Supp. 816 (S.D.Ohio 1983).

18. Resolution of the likelihood of confusion issue requires a consideration of numerous factors. *SquirtCo. v. Seven–Up*, 628 F.2d at 1091. Pertinent factors include:

   (a) the strength of the owner's mark;

   (b) the similarity between the owner's and the alleged infringer's marks;

   (c) the alleged infringer's intent to "pass off" its goods as those of the trademark owner;

   (d) the type of product, its cost and the conditions of purchase;

   (e) the products' competitive proximity; and,

   (f) incidents of actual confusion. *Id.*

19. Plaintiff has established the strength of its marks by: (i) its presumptively valid federal registrations; (ii) the enormous public exposure to 1st Nationwide through advertising, customer dealings and unsolicited publicity; (iii) the absence of third party uses of the name Nationwide to identify banking intitutions; and (iv) defendant's own testimony as to plaintiff's reputation and exclusive use of

Nationwide. *Iowa Farmers Union v. Farmers' Educational & Coop U.*, 247 F.2d 809, 817 (8th Cir.1957), *American Scientific Chem. v. American Hosp. Supply*, 690 F.2d 791, 793–794 (9th Cir.1982), *Armco, Inc. v. Armco Burgular Alarm Co., Inc.*, 693 F.2d 1155, 1159 (5th Cir.1982).

20. The allowance of later registrations to plaintiff for the disclaimed portion based on proof of distinctiveness provides a strong presumption of secondary meaning. 15 U.S.C. § 1057(b). 1 McCarthy, *Trademarks and Unfair Competition*, (2nd Ed. 1984) Sec. 11.16, p. 473 (see also Conclusions paras. 8–11).

21. Similarity between plaintiff's and defendant's marks is judged by comparing the marks as to sound, appearance and meaning. *Canadian Imperial Bank of Commerce v. Wells Fargo Bank*, 811 F.2d 1490, 1495 (CAFC 1987). Side-by-side comparison is not the best. *Union Carbide Corp.*, 531 F.2d at p. 382.

22. The overall impression created by plaintiff's 1st Nationwide marks for its savings and loan services is strikingly similar to defendant's Nationwide Savings. *Citibank N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1547–8 (11th Cir.1984).

■ 23. The fact that plaintiff changed its name from Frist Nationwide Savings to First Nationwide Bank does not avoid confusion with Nationwide Savings. The difference between the generic words "savings" and "bank" will not be the focus of purchasers' attention. See *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir.1983). Moreover, consumers are still exposed to plaintiff's 1st Nationwide Savings name, e.g. on passbooks, mortgage documents, certificates of deposit. Plaintiff is still sometimes referred to as 1st Nationwide Savings in press articles.

24. The presence of the word "1st" in plaintiff's mark which is commonly used by banking institutions around the country does not avoid confusion.

■ 25. Defendant's use of its horse logo will not avoid confusion. Logos will

be absent in radio ads as well as word of mouth advertising. *Hills Bros. Coffee v. Hills Supermarket, Inc.*, 428 F.2d 379, 381 (2nd Cir.1970).

26. Bad faith may also be found where defendant proceeded with knowledge of plaintiff's objection. *National Football League Properties v. N.J. Giants*, 637 F.Supp. 507, 518 (D.N.J.1986).

27. Defendant had no substantial investment in Nationwide before receiving plaintiff's objection in November, 1986.

28. Before plaintiff's objection, defendant had run only a few ads referring to Nationwide Savings in July–August 1986. These ads also referred to defendant as West Helena Savings & Loan. Defendant proceeded with its use of Nationwide Savings with knowledge of plaintiff's objection.

29. Bad faith may be found where defendant has no credible explanation for the choice of its mark. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2nd Cir.1969).

30. Defendant's explanation that it adopted "Nationwide" to describe its business is not credible. This explanation is belied by defendant's statement under oath to the Arkansas Savings and Loan Board that he chose Nationwide because of First Nationwide's good reputation. Defendant's claim that Nationwide is descriptive of defendant's business is also belief by defendant's argument that defendant's use of Nationwide Savings is confined to Arkansas. If defendant's business is confined to Arkansas, the name Nationwide would be a misnomer.

31. Even a knowledgable, sophisticated purchaser of banking products and services is likely to be confused by defendant's use of Nationwide Savings. Sophisticated consumers in the banking field, are "more aware of the deregulation and diversification of the financial services industry." Consumers will assume that defendant Nationwide Savings is a branch or member of plaintiff First Nationwide.

32. Defendant's use of Nationwide Savings is likely to mislead potential customers

of plaintiff's services into an initial interest in defendant. *Mobile Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2nd Cir.1987).

33. Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement. *SquirtCo. v. Seven–Up Co.*, 628 F.2d at 1091.

34. Defendant and plaintiff both provide savings and loan services. Defendant and plaintiff both buy and sell mortgages, make loans and accept deposits at specified rates of interest. Defendant and plaintiff both do business in the secondary market.

35. Defendant's services are directly competitive with plaintiff's services and the services of 1st Nationwide Network members.

36. The use of 1st Nationwide Network by 1st Nationwide Network, Inc. and the members of the 1st Nationwide Network program inures to the benefit of plaintiff. 15 U.S.C. § 1055.

37. Even if the parties were not directly competitive, "[i]n this case, both parties are banks, and this adds substantially to the likelihood of confusion. The danger of confusion that would compromise plaintiff's reputation exists even though the parties may not directly compete for deposit customers." *Citibank N.A.*, 724 F.2d at 1548.

38. Plaintiff's plans for future expansion including plans for continued national advertising, plans for Public Television advertising in Arkansas and plans to establish 1st Nationwide Network members in Arkansas are relevant to a determination of trademark infringement. This evidence is pertinent to plaintiff's plans to bridge the gap (proximity of services), a standard factor to consider in determining likely confusion. *SquirtCo*, 628 F.2d at 1091.

39. Actual confusion is not required to support a finding of trademark infringement. The test is likelihood of confusion. *SquirtCo*, 628 F.2d at 1091.

40. The Court has the power to grant injunctions according to the principles of equity. 15 U.S.C. § 1116(a).

41. The balancing of equities clearly favors plaintiff, especially where defendant is in the start-up phase of activity. *Horizon Financial v. Horizon Bancorp*, 2 U.S.P.Q. 2nd 1696, 1705 (E.D.Pa.1987) [available on WESTLAW, 1987 WL 6333].

42. Defendant continues to use the name West Helena Savings and Loan on the exterior signs for its West Helena premises. Prior to November, 1987, substantially all of defendant's advertisements for its West Helena premises that referred to Nationwide Savings and Loan also referred to West Helena Savings and Loan.

43. Prior to November, 1986, when plaintiff objected to defendant's use of Nationwide, defendant had virtually no investment in the name Nationwide.

44. Any investment defendant may have made in the name Nationwide Savings after plaintiff's objection was a calculated risk and is no reason to deny injunctive relief. *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1279 (S.D.N.Y. 1986).

45. Defendant's use of Nationwide Savings not only endangers plaintiff's reputation, but the reputation of members of plaintiff's First Nationwide Network. First Nationwide Network members, recognizing the value of the First Nationwide mark, have been contributing to national advertising for First Nationwide Network since 1983. The unauthorized use of Nationwide by defendant permits defendant to benefit from this national advertising and exposes First Nationwide Network members to the possible risk of adverse publicity resulting from defendant's use of Nationwide. If defendant's use of Nationwide is not halted, First Nationwide Network members "will lose confidence" in plaintiff's program and the value of First Nationwide Network membership "will be impaired", thus harming plaintiff's business. *National Football League Properties v. N.J. Giants*, 637 F.Supp. 507, 513 (D.N.J. 1986).

46. Defendant argues that it adopted the name Nationwide Savings prior to the issuance of plaintiff's 1986 registrations for the word marks 1st Nationwide Savings and 1st Nationwide Network. Defendant refers to this as the "prior use defense." Defendant's first use in July, 1986, is in no way prior to plaintiff's first use in January, 1982. Defendant's use two weeks prior to the issuance of certain of plaintiff's federal registrations does not furnish any defense here. Use made prior to the issuance of federal registration may only be a defense where defendant had no knowledge of plaintiff's prior use. 15 U.S.C. § 1115(b)(5). *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 640 (D.C.Cir.1982).

47. Defendant argues that the existence of the disclaimer for the word portion of plaintiff's first registration issued in December, 1983, is a basis for excusing defendant's infringing use. But even if plaintiff had not obtained later registrations without the disclaimer, defendant's use would be an infringement. Disclaimers are not material to the issue of likely confusion. The public is not aware of what words have been disclaimed. *Industria Espanola de Perlas IM. S.A. v. National Silver Co.*, 459 F.2d 1049, 1052 (C.C.P.A. 1972).

48. Plaintiff's later registrations that do not contain disclaimers for the words 1st Nationwide and that were allowed and passed to publication prior to defendant's use in July, 1986, are also *prima facie* evidence of distinctiveness at the time of allowance. (See *Evelyn Wood Reading Dynamics Institutes of America v. Zimmerman*, 134 U.S.P.Q. 475 at 481 and *Arica*, 557 F.2d at 342).

49. Moreover, plaintiff is entitled to rely on its common law rights, regardless of its registrations. 15 U.S.C. § 1056(b).

50. Defendant argues that plaintiff's advertising is inconsistent because there are frequent references to the words 1st Nationwide Savings without plaintiff's "N1" logo design. But use of the word mark 1st Nationwide Savings without the logo design is one way of building up secondary meaning in the word mark, i.e. by exposing the consumer to the word mark alone.

51. Plaintiff builds up good will in the word mark alone and this good will is the essence of a trademark.

■ 52. There is no requirement that plaintiff use an R in its advertising. The statutory provision pertaining to use of registration symbols is permissive. 15 U.S. C. § 1111.

53. Defendant seeks to cancel plaintiff's registrations, asserting 1) abandonment and 2) fraud.

54. Plaintiff continues to be referred to as 1st Nationwide Savings and that name still appears on documents (e.g., passbooks) used by the consumer. The continued existence of good will in the name 1st Nationwide Savings precludes a finding of abandonment. 1 McCarthy, *Trademarks and Unfair Competition*, Supplement, Section 17:16, at 64 (2d ed. 1984).

55. Defendant argues that plaintiff allegedly committed fraud on the United States Patent and Trademark Office by inflating advertising figures and not disclosing the *Nationwide Insurance* case. But plaintiff's advertising figures were not inflated and the existence of the *Nationwide Insurance* case was, in fact, communicated to the Patent and Trademark Office. (See history of plaintiff's Registration No. 1,253,930, plaintiff's response dated April 14, 1983.) Moreover, there was no duty to cite the *Nationwide Insurance* case which involved a nonfocusing mark. 15 U.S.C. § 1051(a)(1).

56. Defendant also asserts fraud because: (1) plaintiff claimed widespread distinctiveness (secondary meaning) in prosecuting its applications before the United States Patent and Trademark Office while plaintiff's management was concerned about low consumer awareness in relation to other more famous marks such as Sears and American Express; and (2) plaintiff did not submit to the Trademark Office a consumer awareness survey report dated June, 1986. But defendant does not have any evidence to support, much less carry, the heavy burden of proof as to abandonment and fraud (intentional misrepresentation of material fact). See *Citibank N.A.*

*v. Citibank Group*, 724 F.2d 1540, 1544 (11th Cir.1984).

57. Defendant's counterclaim is dismissed with prejudice.

Accordingly, the defendant, its officers, agents, sales sales representatives, servants, employees, associates, attorneys, successors and assigns, and all persons acting by, through, under or in active concert or participation with them are hereby enjoined as follows:

1. From using the name or mark Nationwide Savings or any colorable imitation of plaintiff's names and marks First Nationwide Savings, 1st Nationwide Network and First Nationwide Bank.

2. From engaging in any course of conduct likely to cause confusion, deception or mistake, or injure plaintiff's business reputation or dilute the distinctive quality of plaintiff's names and marks First Nationwide Savings, 1st Nationwide Network and First Nationwide Bank.

3. From engaging in any course of conduct likely to enable defendant to benefit from the valuable goodwill and reputation established in plaintiff's names and marks First Nationwide Savings, 1st Nationwide Network and First Nationwide Bank.

That all stationery, brochures, labels, advertisements and all other matters, and all means used for production and manufacture thereof, in the custody or under the control of defendant and bearing the name or mark Nationwide Savings or any colorable imitation of plaintiff's names and marks First Nationwide Savings, 1st Nationwide Network and First Nationwide Bank, are ordered delivered up and destroyed in accordance with 15 U.S.C. § 1118, within thirty (30) days of the file-date of this order.

Plaintiff is awarded only the costs of this action, but not reasonable attorney's fees.

Defendant's counterclaim, in all respects, is dismissed with prejudice.