**LAUREL CAPITAL GROUP, INC., Laurel Savings Bank, Plaintiffs,**

v.

**BT FINANCIAL CORPORATION, Laurel Bank, Defendant.**

#### No. Civ.A. 97–311J.

United States District Court, W.D. Pennsylvania.

April 15, 1999.

Hunter A. McGeary, Jr., Dickie, McCamey & Chilcote, Pittsburgh, PA, David M. Kelly, Kristen K. Darnell, Julia Anne Matheson, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for plaintiffs.

Joseph J. Serritella, Pepper Hamilton, George M. Medved, Sharon F. DiPaolo, Dennis M. Sheedy, Pepper Hamilton, Pittsburgh, PA, for defendant.

## MEMORANDUM OPINION AND ORDER

D. BROOKS SMITH, District Judge.

Before the court are cross-motions for summary judgment. Plaintiffs Laurel Capital Savings Group, Inc. and Laurel Savings Bank ("Plaintiffs") have requested partial summary judgment on their trademark infringement action under the Lanham Act, 15 U.S.C. § 1125(a). Defendants BT Financial Corporation and Laurel Bank ("Defendants") have filed a competing motion for summary judgment. For the following reasons, I will grant the Plaintiffs' motion for partial summary judgment and deny the Defendants' motion. As explained *infra*, the precise geographic scope of the parties' respective rights in the mark at issue will be addressed subsequently at the remedial stage of this action. Hence, the geographic scope used to resolve the present motions will not be law of the case for purposes of crafting an appropriate remedy.

## I. FACTS

### A. The Plaintiffs

Plaintiff Laurel Capital Group, a bank holding company, has been the parent

company of plaintiff Laurel Savings Bank since December 1993. Dkt. no. 40, Exh. 1, at 2. At the present time, Laurel Savings Bank is a Pennsylvania state-chartered stock savings bank conducting business at six branch offices clustered along Route 8 in Allegheny County and lower Butler County in Western Pennsylvania. *Id.* at 2–3.[1]

The predecessor to Laurel Savings Bank, known as Laurel Savings Association, was formed in 1981 when Peoples Savings Association merged with Allison Park Savings and Loan Association. *Id.* at 2. In May 1981, a committee consisting of two directors from each of the merged institutions was appointed to choose a name, preferably one associated with Pennsylvania. The committee initially chose "Mountain Laurel" after the state flower, but shortened it simply to "Laurel" and named the new entity "Laurel Savings Association." Dkt. no. 43, Exh. 2, at 4–5. At the time, the committee was unaware of any other banking institutions using the name "Laurel" in any fashion. *Id.* at 7–8. The name was approved by the combined entity's board in mid-December 1981 and used beginning in early January 1982.[2] *Id.* at 6.

Between 1982 and 1995, Laurel Savings Association operated as a state-chartered savings association at the same six branches now operated by the Plaintiffs. Dkt. no. 40, Exh.1, at 3. It offered a variety of banking services to Pittsburgh-area individuals and commercial customers including mortgage loans, installment loans, checking accounts, certificates of deposit, passbook, club and money market accounts, night depository services, U.S. Savings Bond sales and redemptions, travelers' checks, money orders and retirement accounts (IRA, KEOGH, SEP).

Dkt. no. 57, Exh. 1, at 4. ATM services were made available to individuals and commercial customers in 1983, credit card merchant charge services to commercial customers in 1984, and credit card and safety deposit boxes to individuals and commercial customers in 1987. *Id.* In addition, as of 1982, Laurel Savings Association branches were authorized to offer commercial real estate lending and, to a limited extent, non-interest bearing demand deposit accounts and interest bearing negotiable order of withdrawal ("NOW") accounts. Dkt. no. 60, Exh. 4, at 1–2.

As a savings association, Laurel Savings was subject to regulation by the Office of Thrift Supervision ("OTS") and required to pay annual OTS assessment charges. Dkt. no. 57, Exh. 1, at 3. In January 1995, in an effort to avoid further OTS charges, Laurel Savings Association converted to a state-chartered stock savings bank, thereby becoming subject instead to regulation by the Federal Deposit Insurance Corporation ("FDIC"). Accordingly, Laurel Savings Association changed its name to Laurel Savings Bank to reflect the change in its charter. *Id.* at 5. The conversion, however, did not alter the institution's range or type of services, or its customer base. *Id.* at 4–5; Dkt. no. 40, Exh. 1, at 2.

Laurel Savings Bank, currently holding over 35,000 customer accounts, primarily serves individuals and businesses proximately located near its six branch offices. Dkt. 40, Exh. 1, at 4, 12–13. Its customers hale mostly from Allegheny and southern Butler Counties. These branch offices, however, do serve individuals who, while residing in the nearby contiguous counties of Armstrong, Beaver, Washington and Westmoreland, find it convenient to bank in the Allegheny southern Butler area.

---

1. These are the Allison Park, Deer Lakes, Etna, Morningside, and Shaler branches in Allegheny County and the Saxonburg branch in Butler County. *Id.* at 3.

2. Plaintiffs argue that 1981 is the relevant adoption date. It appears, however, that while the naming committee chose "Laurel" in 1981, Laurel Savings Association began actual use of the mark in 1982. Dkt. no. 58, Exh. A, at 3. Accordingly, I will consider 1982 the relevant date.

*Id.* at 12–13. Laurel Savings Bank uses the color green and a stylized "L" logo in its marketing materials. *See e.g.,* Dkt. no. 42, Exhs. K, M, O.

Over the years, while continuing to operate at the same six branch offices, Laurel Saving Bank's business has grown at a moderate pace. *See* Dkt. no. 40, Exh. 1, at 4. Its current assets exceed $212,000,000, up from $177,729,000 in 1994. *Id.* Laurel Savings Bank has considered acquiring or opening new branch offices in Allegheny and Westmoreland Counties, but has yet to do so. *Id.*

## B. The Defendants

Defendant BT Financial Corporation is a bank holding company headquartered in Johnstown, Pennsylvania. Dkt. no. 50, Exh. C, at 2. Defendant Laurel Bank, a wholly owned subsidiary of BT Financial, traces its roots back to the First National Bank of Ebensburg, a commercial bank which opened its first branch office in Cambria County in 1897. *Id.* By 1974, the First National Bank of Ebensburg had grown considerably through new branch offices and acquisitions. *Id.;* Dkt. no. 50, Exh. D, at 9–11. As the Bank grew, however, there was increasing concern that the regionality of the "Ebensburg" name no longer reflected its geographic service area. Dkt. no. 50, Exh. C, at 3. Thus, in 1974, the First National Bank of Ebensburg changed its name to "The Laurel National Bank" and adopted Pennsylvania's state flower, the Mountain Laurel, for use in its marketing endeavors. *Id.* at 3. The name change was extensively advertised in various media, through open house events, and a campaign to give away 10,-000 laurel bush seedlings. *Id.*

The Laurel National Bank was acquired by defendant BT Financial Corporation on January 1, 1985. Dkt. no. 50, Exh. C, at 3. It immediately converted to a state charter so as to be subject to the same federal regulator as BT Financial's other commercial subsidiary, the Johnstown Bank and Trust Company. *Id.* The conversion had no impact on Laurel National Bank's range of powers and services, but it did require the Bank to drop "National" from its corporate name. *Id.* Thereafter, it carried on its commercial banking business as "Laurel Bank," a BT Financial affiliate.

Meanwhile, from its headquarters in Johnstown, BT Financial continued to expand westward. In 1991, BT Financial acquired Peoples Federal Savings Bank of New Kensington. Dkt. 43, Exh. 6, at 25. It began to operate Peoples' branches in Tarentum and Natrona Heights in Allegheny County, New Kensington and Lower Burrell in Westmoreland County and Sarver in Butler County as branches of the Johnstown Bank and Trust Company ("JBT"). *Id.* In 1993, BT Financial acquired First South Financial Corporation and began to operate First South's six branches in Allegheny County (Brookline, Brentwood, Pleasant Hills, Mount Oliver, Carson Street in Pittsburgh's South Hills and McCandless Township in Pittsburgh's North Hills) and one in Washington County (Donaldson's Crossroads) as branches of another BT Financial subsidiary, Fayette Bank. *Id.* at 25–26.

On October 10, 1997, BT Financial consolidated its three affiliate commercial banks—Fayette Bank, JBT and Laurel Bank—into one institution. BT Financial proposed to call the consolidated entity "Laurel Bank." Dkt. no. 50, Exh. C, at 3. "Laurel" was chosen to reflect the institution's wide geographic distribution and to capitalize on the goodwill and customer recognition associated with the name. *Id.* As a result of the consolidation, the newly formed Laurel Bank had seventy-two branch offices in twelve counties: Allegheny, Armstrong, Butler, Fayette, Westmoreland, Somerset, Bedford, Blair, Cambria, Indiana, Greene, and Washington.[3]

---

3. Simultaneously with this consolidation, BT Financial changed the name of its trust company subsidiary from BT Management Trust Company to Laurel Trust Company and the name of its community development company from Moxham Community Development Cor-

Prior to the consolidation, Laurel Bank had operated at twelve branch offices located across three counties—Blair, Cambria and Indiana—variously 70 to 100 miles east of the Pittsburgh metropolitan area.

## C. The Litigation

In March 1997, the Plaintiffs learned of defendant BT Financial's plan to merge Fayette Bank, JBT, and Laurel Bank into an institution named "Laurel Bank." Dkt. no. 40, Exh. 1, at 12. Concerned because some of the Fayette Bank and JBT branch offices were located in or near areas already served by Laurel Savings Bank,[4] Plaintiffs notified BT Financial of their prior use of the "Laurel" mark in those areas. *Id.* at 19. In spite of the Plaintiffs' continued assertion in a series of letters of its superior rights in the mark, Dkt. no. 42, Exhs. FF, GG, and HH, defendant BT Financial consummated its October 10, 1997 consolidation and began the process of renaming and advertising the merged institution's new name. Dkt. no. 42, Exhs. II, JJ, KK (print and billboard name change advertisements). The new Laurel Bank put out a small number of advertisements and erected a few billboards in the Pittsburgh area, using the color green and a stylized "L" logo similar to that of Laurel Savings Bank. *See id.*

On November 19, 1997, Plaintiffs filed suit under the Lanham Act, seeking a preliminary and permanent injunction to prevent Defendants from using the "Laurel" mark or any similarly confusing mark in connection with banking services in the Pittsburgh area. Dkt. no. 1. On December 2, 1997, the parties entered a consent decree preliminarily enjoining the Defendants, pending a trial on the merits, from using "Laurel" or any confusingly similar mark or logo in the six-county area of Allegheny, Armstrong, Beaver, Butler, Washington, and Westmoreland Counties ("the six-county area"). Dkt. no. 33, at 2 ("Amended Consent Decree"). Discovery ensued and on June 15, 1998, both parties filed motions for summary judgment along with extensive sealed supporting exhibits. Dkt. nos. 38, 48. I turn now to these competing motions.

## II. APPLICABLE LEGAL PRINCIPLES

### A. Subject Matter Jurisdiction[5]

#### 1. The Statutory Framework & General Principles

The federal district courts have original jurisdiction of all actions arising under the

---

poration to Laurel Community Development Corporation. Dkt. no. 50, Exh. C, at 4.

4. For example, BT Financial affiliate's branch offices in the Allegheny Valley area of Pittsburgh were approximately nine miles from Plaintiffs' Russelton branch office and the Fayette Bank branch on Carson Street in the South Side area of Pittsburgh was only five miles from Plaintiffs' Morningside office. Dkt. no. 40, Exh. 1, at 13–14. In addition, Laurel Savings Bank had account customers (approximately 9% of its total accounts) located in many of the same areas as existing JBT and Fayette Bank branch offices. *Id.*

5. This issue was not raised by the parties; nevertheless, "[i]t is axiomatic that federal courts are courts of limited jurisdiction, and as such are under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case." *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1049

(3d Cir.1993). Thus, I must consider the issue *sua sponte*. To that end, I directed the parties to provide supplemental briefs on this issue, Dkt. no. 67, and specifically "reminded [them] that they cannot confer subject matter jurisdiction by consent. *See California v. LaRue*, 409 U.S. 109, 112 n. 3, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972)." *Id.* Both parties responded, dkt. nos. 68, 69, but defendants' "brief" consisted solely of a letter in which counsel stated that his client had "directed us not to submit a letter brief on the jurisdictional issue but to defer to the Court's judgment with respect to it." Dkt. no. 69. This response did not constitute compliance with my order, and deprived me of meaningful input from one of the two litigating parties. Rather than further delay disposition of the instant motions, I proceed to resolve the jurisdictional issue.

Lanham Act. *See* 15 U.S.C. § 1121. Under the Act,

> "[a]ny person who, on or in connection with any goods or services ... uses in commerce any word, term, [or] name ... which [is] likely to cause confusion ... as to the affiliation, connection or association ... or as to origin, sponsorship, or approval of his or her goods, services or commercial activities ... shall be liable in a civil action by any .person who believes that he [ ] is likely to be damaged by such act."

15 U.S.C. § 1125(a)(1).

"Use in commerce" is defined by the Act to mean "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. Specifically, a service mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State...." *Id.*

The Act also defines "commerce" to mean "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. It is axiomatic that Congress may lawfully regulate, in addition to interstate commerce, purely intrastate activities which have a "substantial effect" on interstate commerce. *See Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 453 n. 1 (11th Cir.1984) ('in commerce' jurisdictional requirement requires only effect on commerce); *Pure Foods v. Minute Maid Corp.*, 214 F.2d 792, 795 (5th Cir.1954) (Lanham Act extends to activities local in nature which have substantial economic effect on interstate commerce); *Mother Waddles Perpetual Mission, Inc. v. Frazier*, 904 F.Supp. 603, 611 (E.D.Mich.1995) (interstate commerce jurisdictional requirement may be met by showing that the defendant's use, while intrastate, substantially affected interstate business). Moreover, the Supreme Court has long advocated liberal construction of the Lanham Act's "in commerce" requirement, *see Steele v. Bulova Watch Co.*, 344 U.S. 280, 283, 73 S.Ct. 252, 97 L.Ed. 319 (1952),

which has been characterized as minimal. *See Berghoff Restaurant Co., Inc. v. Lewis W. Berghoff, Inc.*, 357 F.Supp. 127, 130 (N.D.Ill.1973); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25:57 (4th ed.1999) (hereinafter *"McCarthy on Trademarks"*) ("It is difficult to conceive of an act of infringement which is not 'in commerce' in the sense of the modern decisions. Thus, it may not be inaccurate to predict that the 'use in commerce' requirement will not be much of an issue in future litigation, barring cases with unusual twists in the facts.").

The Act calls for an assessment of the defendant's "in commerce" use of the mark. *See* 15 U.S.C. § 1125 (any person that "uses in commerce" a mark likely to cause confusion (*i.e.*, defendant) "shall be liable in a civil action to any person who believes that he or she is likely to be damaged by such act" (*i.e.*, plaintiff)); *see also Schroeder v. Lotito*, 577 F.Supp. 708, 715 (D.R.I.1983) (the improper use must be in interstate commerce). The courts, however, have repeatedly found jurisdiction where the defendant's use is solely intrastate, provided the plaintiffs business activities "involve" or "affect" interstate commerce. *See e.g., Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 343 n. 5 (5th Cir.1984); *Coca–Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir.1980) ("substantial effect" is present where "the trademark owner's reputation and good will, built up by use of the mark in interstate commerce, are adversely affected by intrastate infringement"); *Burger King of Florida, Inc. v. Brewer*, 244 F.Supp. 293, 297 (W.D.Tenn.1965) (advertising by plaintiff put the mark in interstate commerce). Only those disputes which are "purely" intrastate fail to implicate the Lanham Act. *See Jellibeans, Inc. v. Skating Clubs, Inc.*, 716 F.2d 833, 838 (11th Cir.1983); *Tax Cap Committee v. Save Our Everglades*, 933 F.Supp. 1077, 1080–81 (S.D.Fla.1996) (no Lanham Act jurisdiction where the mark, used in gathering petition

signatures solely in Florida for political purposes, was not used in commerce).

■ When assessing the parties' activities, however, it is vital to understand the conceptual difficulty inherent in the wording of the Lanham Act. For the Act to apply, the *mark itself* must be used in interstate commerce; it is insufficient that the parties' *business* is, by its nature, interstate or is one that effects interstate commerce. Very few courts have taken notice of this distinction. It is perhaps best explained in *Licata & Co., Inc. v. Goldberg*, 812 F.Supp. 403 (S.D.N.Y.1993):

> The Lanham Act's reach, while long, does not extend to the full outer limits of the commerce power. Its plain meaning—the Lanham Act utilizes the term "in commerce" rather than "affecting commerce" or the even broader "industry affecting commerce"—reflects a legislative judgment that for the statute to apply, the questioned advertising or statements, and not merely the underlying commercial activity, must be disseminated in commerce—i.e., not be purely local.

*Id.* at 409; *see also Blazon, Inc. v. DeLuxe Game Corp.*, 268 F.Supp. 416 (S.D.N.Y. 1965) (it is the transportation of the item with the mark on it rather than the general scope of the business which is determinative under the statute). Thus, we can-

not base jurisdiction simply on the obvious fact that these parties, both banks, operate in or substantially affect interstate commerce.[6]

■ What counts, then, are the steps taken by each party to place its mark in interstate commerce. Where the parties advertise beyond state borders or claim patrons residing outside the state, the courts have been very liberal in favor of finding jurisdiction. *See Rickard*, 735 F.2d at 453 n. 1 (buyers responding to the defendant's ads and the sellers which place them are *occasionally* from across state borders); *Jellibeans, Inc.*, 716 F.2d at 838 (patrons from beyond state borders); *Mother Waddles*, 904 F.Supp. at 611 (defendant's radio ads broadcast out of state); *see also* Annotation, *What Constitutes "In Commerce" Within the Meaning of § 32(1) of Lanham Trade–Mark Act (15 USCS § 1114(1)) Giving Right of Action for Infringement of Trademark "In Commerce"*, 15 A.L.R.Fed. 368 (1973 & Supp. 1998) (seemingly intrastate activity is sufficient where there are records of out of state patrons and proof of advertising in newspapers with interstate distribution).

Many of the cases where jurisdiction is deemed appropriate involve national advertising. *See e.g., Kampgrounds*, 415 F.Supp. at 1290–91 (advertising in camping publications with national circulation); *Lobo Enterprises v. Tunnel, Inc.*, 822 F.2d

---

**6.** I need not ignore the nature of the parties' underlying business, however. Two cases specifically dealing with service marks are instructive. First, in *Application of Gastown*, 51 C.C.P.A. 876, 326 F.2d 780 (C.C.P.A.1964), the applicant appealed the Trademark Board's refusal to permit federal registration of its service mark for an alleged failure to satisfy the "in commerce" requirement. The applicant's roadside automotive services were confined to Ohio, but its customers, interstate travelers, were ·engaged in interstate commerce when they used the applicant's services. *Id.* at 781–82. In addition, those services were billed to the customers' out of state addresses. The court found that the mark was used in the sale of services rendered in commerce. *Id.* at 782. Likewise, in *Kampgrounds of Am. v. North Del. A—OK Campground, Inc.*, 415 F.Supp. 1288 (D.Del.1976),

the court applied the *Gastown* rationale in analyzing the parties' interstate use of a service mark. According to Judge Stapleton, then sitting as a district judge, defendant campground provided services to a transient population which was itself engaged in interstate commerce. Such activities, combined with interstate advertising and road signs, "constituted sufficient indicia of interstate business to fall within the 'commerce' requirement of the Lanham Act." *Id.* at 1291. Thus, even though banking customers are readily distinguishable from interstate travelers and campers, it is legitimate to point out that activities undertaken by the parties' customers (*i.e.,* paying with "Laurel" embossed checks, ATM or credit cards), which coincide with use of the parties' banking services, culminate in use of the "Laurel" mark in the channels of interstate commerce.

331, 333 (2d Cir.1987) (travel guides and other publications with interstate circulation). I have yet to see, however, any suggestion in the caselaw that the parties must actually intend that their mark travel in interstate channels. Indeed, it appears to be enough if, for instance, their radio or newspaper ads happen to be regularly carried beyond state borders.

With the foregoing principles in mind, I turn to the evidence of interstate use adduced by the Plaintiffs.

## 2. Application

Defendants have affirmatively used their mark in interstate commerce. First, and perhaps most importantly, they maintain an Internet website which prominently features and promotes defendant Laurel Bank's services in connection with the "Laurel" mark.[7] This website is accessible to customers worldwide. As the District Court for the Southern District of New York recently reasoned:

> Internet users constitute a national, even international, audience, who must use interstate telephone lines to access defendant's website ... The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's "in commerce" requirement.

*Planned Parenthood Fed., Inc. v. Bucci,* No. 97–629, 1997 WL 133313, *3, 1997 U.S.Dist. LEXIS 3338, *10–12 (S.D.N.Y. Mar. 24, 1997), *aff'd mem.,* 152 F.3d 920 (2d Cir.), *cert. denied,* — U.S. ——, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998); *accord Intermatic, Inc. v. Toeppen,* 947 F.Supp. 1227 (N.D.Ill.1996); 2 Jerome Gilson & Anne Gilson Lalond, *Trademark Protection and Practice* § 511[2] (1998) ("because Internet communications transmit instantaneously on a worldwide basis, there is little question that the 'in com-

merce' requirement [of the Lanham Act] would be met in a typical Internet message"). Accordingly, Defendants' maintenance of a website prominently featuring the "Laurel" mark strongly supports Lanham Act jurisdiction.

Second, there are at least forty Laurel Bank accounts held by customers who reside outside of Pennsylvania. *See* Dkt. No. 68, Exh. A; *Jellibeans Inc.,* 716 F.2d at 838 (district court finding of interstate contact not clearly erroneous where plaintiff drew patrons from out of state); *Rickard,* 735 F.2d at 453 n. 1 (buyers and sellers who used the parties' publishing services occasionally hailed from across state lines); *University of Florida v. KPB, Inc.,* 89 F.3d 773, 776 n. 1 (11th Cir.1996) (jurisdiction proper where 15% of student body from out-of-state). This fact also supports Lanham Act jurisdiction.

Third, Defendants engage in some interstate advertising, although its extent is very limited, and the fact that the Defendants' chosen publications are circulated beyond state borders appears to be merely incidental. *Cf. Lobo Enterprises,* 822 F.2d at 333 ("in commerce" requirement satisfied where service mark was significantly advertised in travel guides); *Kampgrounds,* 415 F.Supp. at 1291 (camping publications with national circulation). The *Pittsburgh Post–Gazette,* for example, is distributed outside of Pennsylvania. *See* Dkt. No. 68, Exh. B. Nonetheless, even small amounts of interstate advertising have been repeatedly cited as strong support for Lanham Act jurisdiction. *See Mother Waddles,* 904 F.Supp. at 611 ("[i]nterstate advertising is sufficient interstate activity for Lanham Act purposes").[8]

Overall, the Defendants' use of the mark in interstate commerce is sufficient to support Lanham Act jurisdiction in this case. That position is further strengthened by

---

7. Http://www.btfinancial.com/laurel–bank.

8. It bears noting that Defendants have filed five trademark applications, all of which allege use of the "Laurel" mark in interstate commerce. *See Miles Labs., Inc. v. Frolich,* 195 F.Supp. 256, 257 (S.D.Cal.1961), *aff'd,* 296 F.2d 740 (9th Cir.1961).

an examination of the Plaintiffs' use of the mark. Like the Defendants, Plaintiffs boast a significant number of customers who reside out of state. *See* Dkt. no. 68, Exh. D (listing 86 accounts). In addition, they too advertise in the *Pittsburgh Post–Gazette,* which circulates beyond state borders.

Accordingly, these facts provide strong support for a finding that both parties use the mark in commerce in connection with their services. I therefore conclude that this court has subject matter jurisdiction over the case *sub judice.*

## B. The Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. It can meet this burden simply by pointing to the absence of evidence to support the nonmovant's case. *Id.* at 325, 106 S.Ct. 2548. The nonmoving party must then go beyond the pleadings and, through other admissible evidence, demonstrate the existence of a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. To make the required evidentiary showing, the nonmoving party must "introduce evidence from which a rational finder of fact could find in [his] favor." *Colburn v. Upper Darby Township,* 946 F.2d 1017, 1020 (3d Cir.1991). The non-moving party is afforded the benefit of all reasonable inferences drawn from the record. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994).

## C. Basic Trademark Principles

Section 43(a) of the Lanham Act prohibits use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities." 15 U.S.C. § 1125(a). Neither Plaintiff Laurel Savings Bank nor Defendant Laurel Bank have registered their names as trade or service marks under federal or state law.[9] Registration, however, is not a prerequisite for protection and recovery under the

---

9. Defendant BT Financial filed for federal registration of the "Laurel Bank" mark on May 13, 1997. Dkt. no. 46, Exh. 33 D. BT Financial related companies have filed applications for "Laurel Line," "Laurel Link," "Laurel and Design" and "Laurel Trust Company." *Id.*, Exhs. A, B, C.

Even if Defendants successfully register the "Laurel" mark, they will still be subject to the prior rights of a common law user in a remote geographic area. This is because trademark registration does not create the underlying right to exclude; trademark ownership and attendant rights are acquired by use in the marketplace. *See 3 McCarthy on Trademarks* § 19:3. "When two parties acquire common law rights in a mark in different areas and the [senior user] registers the mark, then the registered owner's rights can become incontestable. [However,] [t]he other common law owner [*i.e.,* the junior user] does retain exclusive rights in the mark in areas where his use antedated the registration." *Freedom Sav. & Loan Ass'n v. Way,* 583 F.Supp. 544, 553 (M.D.Fla.1984); *see also Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1395 (3d Cir.1985) ("[A] federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific markets notwithstanding the senior user's failure to register."); *V & V Food Prods., Inc. v. Cacique Cheese Co.,* 683 F.Supp. 662, 667 (N.D.Ill. 1988) (federal registrant, even though presumed to have exclusive rights nationwide, is still subject to the common law user's superior rights in areas where that user has established "continuous prior use").

Lanham Act. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986). When the mark is unregistered, the parties' rights are determined according to the common law. *See e.g., Dominion Bankshares Corp. v. Devon Holding Co., Inc.*, 690 F.Supp. 338, 344 (E.D.Pa.1988).

█ Both parties use "Laurel" as a service mark or a trade name. *See First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 651 (10th Cir.1996); *Union Nat'l Bank v. Union Nat'l Bank*, 909 F.2d 839, 841 n. 2 (5th Cir.1990) (banks provide services, so the terms at issue appropriately designated "service marks"). A "service mark" is defined in the Lanham Act as "any word, name, symbol, or device, or any combination thereof [ ] used by a person ... to identify and distinguish the services of one person [or entity], ... from the services of others and to indicate the source of the services." *See* 15 U.S.C. § 1127. For practical purposes, trademarks, trade names and service marks "are subject to the same substantive rules of validity and infringement." 1 *McCarthy on Trademarks* § 4:14; *see also Country Floors Inc. v. Gepner*, 930 F.2d 1056, 1064 n. 2 (3d Cir.1991).[10]

█ Under the common law, trademark rights are acquired through actual use. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916). To establish a common law infringement claim, a Plaintiff must show: (1) that it is the owner in the relevant area of a mark that is distinctive and protectible, and (2) that the Defendant's actions cause a likelihood of confusion. *See e.g., Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir.1991).

█ Only certain marks merit protection. Thus, a threshold issue is always the mark's distinctiveness. Trade and service marks are typically classified into categories: arbitrary (or fanciful), suggestive, descriptive and generic. *A.J. Canfield*, 808 F.2d at 296. An arbitrary mark is one which bears "no logical or suggestive relation to the actual characteristics" of the service; a suggestive mark suggests rather than describes the characteristics of the services. *Id.* Arbitrary and suggestive marks are inherently distinctive and entitled to protection without proof of secondary meaning. In contrast, descriptive marks, which describe a characteristic of the service, require proof of secondary meaning for protection.[11] *Id.; see generally* 2 *McCarthy on Trademarks*, Ch. 11, *passim.* Generic marks, which function as the common descriptive name of a service class, are entitled to no protection at all.

█ Ownership via use of the mark is the next fundamental issue, for which it is necessary to identify, as between the competing users, who is the senior and junior user. *See ACCU Personnel Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1204 n. 12 (D.Del.1994). The "senior user" is typically the first to use the mark anywhere in the United States. *Id.; see also* 4 *McCarthy on Trademarks* § 26.5. "In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question," *ACCU Personnel*, 846 F.Supp. at 1204–05 (citing *Hanover Star*, 240 U.S. at 415, 36 S.Ct. 357)), and that the trademark rights of the senior user trump those of the junior user. *Id.*

█ However, where two users operate in geographically remote markets, prior appropriation is legally insignificant. *Id.* at 1205. This is because each user

---

10. For the sake of simplicity, "mark" or "trademark" will be used throughout this opinion.

11. A mark has attained "secondary meaning" when customers make a mental association between the mark and its unique source (*i.e.*, when the mark and the business become synonymous in the public mind). *See* 2 *McCarthy on Trademarks* § 15.5.

attains rights in the mark in the remote market according to actual use. Thus, a senior user enters a remote market subject to the trademark rights already acquired, in good faith, by another user. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Star*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (the *Tea–Rose* case); *see also* Restatement (Third) of the Law of Unfair Competition § 19 (1995). This principle, known as the *Tea–Rose/Rectanus* doctrine, governs territorial rights in unregistered trademarks and permits a junior user to enjoin a senior user's infringing use "in an area where the senior user has no established trade, and hence no reputation and no good will." *Natural Footwear*, 760 F.2d at 1394; *see generally* 4 *McCarthy on Trademarks* Ch. 26, *passim* ("The Territorial Extent of Trademark Rights"). The *Tea–Rose/Rectanus* doctrine applies to infringement actions premised on § 43(a) of the Lanham Act. 4 *McCarthy on Trademarks* § 26.4, at 26–9–10.

▮▮▮ Users operate in geographically remote markets if neither one's mark has penetrated the market of the other. *ACCU Personnel*, 846 F.Supp. at 1205. In other words, "the mark [must] mean[ ] one thing in one market, [and] an entirely different thing in another." *Rectanus*, 248 U.S. at 100, 39 S.Ct. 48. The good-faith junior user in a remote area is entitled to relief if, at the critical date of its first use of the mark, the senior user's mark was unknown to customers in the area. *Natural Footwear*, 760 F.2d at 1397. This is a test of market penetration, reflecting the principle that no user can preempt a market before it actually enters it. Market penetration is analyzed under four factors, reworded slightly to fit the context of a service mark: (1) the volume of services; (2) positive and negative growth trends in the area; (3) actual customers in relation to potential customers; and (4) the amount of service advertising conducted in the area. *See id.* at 1398–99.

▮▮▮ Even if the senior user has not established market penetration, it may still possess superior rights in the mark in the remote territory via two additional theories. Under the reputation theory, if the senior user's reputation had penetrated the area prior to the junior user's first use of the mark, then the senior user prevails. 4 *McCarthy on Trademarks* § 26:16. This theory is simply an arm of the market penetration test because logically, if a senior user's reputation has penetrated a market before the junior user's use, then the markets are not truly geographically remote. *Id.* Under the "natural zone of expansion" theory if, at the time the junior user first used the mark, it did so in an area within the senior user's "natural zone of expansion," then the senior user prevails. *See e.g.*, *ACCU Personnel*, 846 F.Supp. at 1208. This theory, in addition to having never been expressly adopted or rejected by the Court of Appeals for the Third Circuit, *see id.*, tends to be narrowly interpreted. *See Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1028 (11th Cir.1989); *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F.Supp.2d 1347, 1355–56 (S.D.Fla.1998).

Together, these three theories of market penetration, reputation and natural zone of expansion are known as the "zones of protection;" *see generally* William J. Gross, Comment, *The Territorial Scope of Trademark Rights*, 44 U. Miami L.Rev. 1075 (1990). Defendants' rights are properly assessed under all three. Once the court identifies a situation wherein the junior user actually possesses superior rights in the relevant market area, the final issue is whether the "second comer's" actions cause a likelihood of confusion. While a series of ten factors is typically used to assess the likelihood of confusion, *see Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978); *Horizon Financial, F.A. v. Horizon Bancorp*, 2 U.S.P.Q.2d 1696 (E.D.Pa.1987), where the parties deal in competing services, the court need rarely look beyond the mark

itself. *See Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983).

## III. DISCUSSION

### A. Preliminary Issues

#### 1. Arbitrary Mark

■■■ It is clear that both parties claim rights in an arbitrary mark. "Laurel," used as the dominant portion of both parties' mark, bears no logical or suggestive relationship to the actual characteristics of banking services. *See Dominion Bankshares,* 690 F.Supp. at 345 (service mark "Dominion" is arbitrary mark because it does not tell customers the characteristics, functions, uses or qualities of banking services); *Horizon Financial,* 2 U.S .P.Q.2d at 1702 ("Horizon" is an arbitrary mark because it does not suggest banking services). In choosing "Laurel," both parties intended the obvious tie to Pennsylvania. *See* Dkt. no. 43, Exh. 2, at 5; Dkt. no. 50, Exh. C, at 2. Marks which are geographically descriptive tend to be less distinctive. *See* 2 *McCarthy on Trademarks* § 14.1. "Laurel," however, is not descriptive of geographic location in the same sense as, for example, "Southern" or "Allegheny" and thus I recognize no dilution of distinction. As an arbitrary mark, "Laurel" is entitled to maximum protection without proof of secondary meaning.

#### 2. Senior/Junior User and the Relevant Market

■■■ As between these two parties, defendant Laurel Bank is the senior user of the mark. *See ACCU Personnel,* 846 F.Supp. at 1204 n. 12. The Laurel National Bank began to use the mark in 1974, and "Laurel" continued to be the mark's focal point even after "National" was dropped from the corporate name. Thus, defendant Laurel Bank's continuous use of the "Laurel" mark since 1974 predates Laurel Savings Association's use which began in 1982.

Prior appropriation, however, does not resolve this case, which presents instead a classic *Tea–Rose/Rectanus* situation, because the parties have built up customer recognition in an identical mark in two different geographic locations within Pennsylvania.[12] I must determine if there exists a genuine issue of material fact as to whether Laurel Savings Bank or Laurel Bank possesses superior rights to the mark in the relevant market. To do so, I must address two additional and intertwined preliminary questions: 1) whether plaintiff Laurel Savings Bank can trace its rights in "Laurel" back to 1982, or only to 1995 when it dropped "Association" to become Laurel Savings "Bank"; and 2) how to define the relevant market in order to resolve the competing motions.

Although Defendants argue their motion as against both dates, they vigorously contend that plaintiff Laurel Savings Bank's trademark rights, if any, date back only to 1995, and not to 1982 when the newly formed Laurel Savings Association first adopted the "Laurel" mark. The dates are significant because defendant Laurel Bank's market penetration, reputation and natural zone of expansion must be assessed as of the date the junior user first began to use the mark in the relevant market. *See ACCU Personnel,* 846 F.Supp. at 1207.

Defendants argue that the Plaintiffs cannot claim "Laurel" in connection with "banking services" until 1995 when Laurel Savings Association became a state-chartered stock "bank" authorized to offer such services. Claiming to have already penetrated the relevant market by that date, Defendants assert that the Plaintiffs created their own problem by choosing a mark too confusingly similar to that of the estab-

---

12. The Court of Appeals for the Third Circuit has rejected Justice Holmes' view, taken in *Hanover,* 240 U.S. at 426, 36 S.Ct. 357, that "a trademark [ ] good in one part of the state [ ] is good in all." *See Jacobs v. Iodent Chemical Co.,* 41 F.2d 637 (3d Cir.1930). *See also ACCU Personnel,* 846 F.Supp. at 1205 n. 14.

lished Laurel Bank.[13] *See Jefferson Bankshares Inc. v. Jefferson Savings Bank,* 14 U.S.P.Q.2d 1443 (W.D.Va.1989) (by changing name from "Jefferson Savings and Loan Association" to "Jefferson Savings Bank," defendants accused of creating the confusion with plaintiff "Jefferson National Bank."). For a number of converging reasons, I reject Defendants' highly technical distinction and afford the Plaintiffs credit for Laurel Savings Association's use of the "Laurel" mark beginning in 1982.

Trademark rights flow in conjunction with the use of a mark to identify particular services. *See Nugget Distributors Coop. v. Mr. Nugget, Inc.,* 776 F.Supp. 1012, 1023 (E.D.Pa.1991). That principle, however, should not be applied to an illogical end. Even if, as a thrift institution, Laurel Savings Association's services were limited prior to the conversion, all three entities— Laurel Savings Association, Laurel Savings Bank and Defendant Laurel Bank— offered, and continue to offer, some overlapping and competing services such as mortgage and installment loans, U.S. Savings Bond sales and redemptions and individual checking accounts. *See* Dkt. no. 57, Exh. 1, at 4. *See also Horizon Financial,* 2 U.S.P.Q.2d at 1699–1700 (savings and loan institutions and commercial banks offer overlapping services). Laurel Savings Association was engaged in the supply of "banking services" as that phrase is commonly understood, and used the mark to identify those services. Commercial banks, including BT Financial affiliates, consider savings and loan institutions (a species of thrift institution) to be in direct competition for such overlapping services. *See* Dkt. no. 43, Exh. 6, at 55–56; Exh. 17, at 23–26.

I recognize that the banking industry has been in flux for a number of years, and a myriad of legal distinctions are frequently invoked to differentiate between financial institutions. *See generally* Frederic S. Mishkin, *The Economics of Money, Banking and Financial Markets* 283–341 (4th ed.1995). It is critical to remember, however, that trademark law has among its purposes the protection of the average customer, one who may lack the business sophistication, or even the time, to make such careful distinctions. *See* 1 *McCarthy on Trademarks* § 2.33. Even if banking customers would ordinarily be expected to exercise discernment in choosing the type of institution that handles their money, *see Horizon Financial,* 2 U.S.P.Q.2d at 1703, and larger commercial customers expected to be more savvy regarding such distinctions, I doubt that most customers understand the difference between a "savings association" and a "bank," particularly where those entities offer overlapping services.

Moreover, while a composite mark must be viewed as a whole, *see* 3 *McCarthy on Trademarks* § 23:41 (*quoting P D Beckwith, Inc. v. Commissioner of Patents,* 252 U.S. 538, 545–46, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ("[t]he commercial impression of a trademark is derived from it as a whole")), it is appropriate to give greater weight to the dominant portion, "for it is that which may make the greatest impression on the ordinary [customer]." 3 *McCarthy on Trademarks* § 23:42; *see also Country Floors,* 930 F.2d at 1065 ("Country," which dominates the competing marks of "Country Floors" and "Country Tiles," is the appropriate focus of analysis). Here, the dominant portion of both parties' mark is "Laurel." Plaintiff Laurel Savings Bank has, in fact, used the shortened version of its name in customer communications and, as a result, submits that

13. Plaintiffs repeatedly suggest that instances of actual confusion which have been documented since Defendants' 1997 consolidation demonstrate that customers acknowledge no differences between savings associations and banks. This argument is flawed, however, since these customers are confusing Laurel

*Bank* with Laurel Savings *Bank,* not with Laurel *Savings Association.* Nonetheless, this confusion strengthens the conclusion that, prior to the 1997 consolidation, Laurel Bank and Laurel Savings Bank were operating in geographically remote markets.

its customers tend to use that shortened version. Dkt. no. 40, Exh. 1, at 9; Dkt. 42, Exhs. L, M, Q. Where it is inevitable that the public will shorten the name or mark, the shortened form provides the proper basis for comparison. *See e.g., Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1320 (E.D.Pa.1987) ("Carnival Club" will inevitably be shortened to "Carnival"). Thus, the focus is on "Laurel," not "Association" or "Bank."

This is the only logical approach. "Bank" and "Association" are generic terms, widely used in the industry. Generic terms are unlikely to be the focus of customer attention and are not protected standing alone. *See First Nationwide Bank v. Nationwide Savings and Loan Association,* 682 F.Supp. 965, 976 (E.D.Ark.1988) ("[t]he difference between the generic words 'savings' and 'bank' will not be the focus of purchasers' attention"). Thus, they should not be used as the sole basis for distinction. Accordingly, 1982 provides the relevant date for assessing Plaintiffs' use of the mark and Defendants' market penetration, reputation, and natural zone of expansion.

■■ At this point, it becomes necessary to briefly address the relevant market area and corresponding geographic scope of the parties' respective trademark rights. As part of their prima facie case, Plaintiffs bear the burden of proving that they own the mark in the relevant market area. *See Ford Motor Co.,* 930 F.2d at 291. The competing motions, however, reveal that the parties define that market quite differently.

The consent decree prohibited the Defendants from using "Laurel" or any confusingly similar mark within the six-county area of Allegheny, Armstrong, Beaver, Butler, Washington, and Westmoreland Counties ("the six-county area"). Dkt. no. 33, at 2. In their supporting briefs, Plaintiffs refer interchangeably to the area in which Laurel Savings Bank has achieved market penetration as the "entire Pitts-

burgh metropolitan area," "the Pittsburgh area" and the "original injunction area" set forth in the consent decree. Dkt. no. 39, at 28; Dkt. no. 60, at 2, 20–21. Plaintiffs have also requested an additional ten-mile buffer zone. Dkt. no. 39, at 28, 43–44. Defendants, confining Laurel Savings Bank's market penetration to the narrow Route 8 corridor surrounding the physical locations of its offices, maintain that the six-county area is overly broad and unduly restrictive of Laurel Bank's growth potential. *See* Dkt. no. 49, at 2.

What the summary judgment submissions truly suggest, however, is that an as yet defined middle ground promises to provide the most appropriate solution. As will be explored in depth, *infra,* while its physical presence is confined to the narrow Route 8 corridor, Laurel Savings Bank's market penetration, by virtue of its marketing efforts and customer placement, is not so circumscribed. On the other hand, defendant Laurel Bank has a demonstrated commitment to westward expansion, penetrating markets at least as far as Westmoreland County prior to the 1997 consolidation. At eight times the size of plaintiff Laurel Savings Bank, Laurel Bank has been and promises to be much more aggressive in its growth strategy.

Having examined each party's submissions, I agree that the six-county area embraced by the consent decree is overly broad but find no genuine issue of material fact regarding the Plaintiffs' claim that Laurel Savings Bank has penetrated some amorphous "Pittsburgh metropolitan area" sufficient to assign it superior rights in the mark. I resolve the competing motions with this in mind, fully aware that I am using a loosely defined "relevant market area" to assess the geographic scope of the parties' respective rights. By establishing through summary judgment that defendant Laurel Bank must yield to the superior trademark rights of Laurel Savings Bank in this loosely defined area, I hope to move the litigation towards final resolution of what I see as the central concern:

whether and to what extent these two banking institutions can co-exist in the far western region of Pennsylvania, specifically the greater Pittsburgh metropolitan area. As noted at the outset, that question is best addressed at the remedial stage, perhaps with the benefit of expert input as to the nature of the market area and the future of the banking industry.[14]

## B. The Zones of Protection

As discussed *supra*, the senior user of a mark enters a remote geographic market subject to the trademark rights of a good-faith junior user in that market. *ACCU Personnel*, 846 F.Supp. at 1204–05. To be entitled to priority of use, the junior user must have adopted the mark in good faith. *Id.* at 1209–10. This typically means "without knowledge" of the senior user's existence. *Id.* On this record, there is no genuine issue of material fact as to plaintiff Laurel Savings Bank's good faith adoption of the mark in 1982.[15] Dkt. no. 43, Exh. 2, at 6–8. Laurel Savings Association's failure to identify another banking institution making extensive use of the "Laurel" mark in the same state and in a market less than 100 miles away reflects poorly on its naming committee's research efforts, but, as it adopted the mark without knowledge of Laurel Bank's existence, and with no design inimical to Laurel Bank's interests, its use was in good faith. *See id.; see also* 4 *McCarthy on Trademarks* §§ 26:6–26:12.

The remaining question is whether either party has demonstrated a genuine issue of material fact regarding which of them possesses superior rights in the mark in the relevant market area. For purposes of this inquiry, Plaintiffs' market penetration is measured as of the date that Laurel Bank proposed to use a confusingly similar mark in that area (*viz.*, after the 1997 consolidation). *See Natural Footwear*, 760 F.2d at 1397 (party asserting ownership must make showing of "clear entitlement," that is, market penetration significant enough to pose real likelihood of confusion among customers in that area); *Sweetarts v. Sunline, Inc.*, 380 F.2d 923 (8th Cir.1967) ("trial court should weigh all the factors including plaintiff's dollar sales at the time the defendants entered the market"). Defendant's market penetration, reputation and natural zone of expansion are measured as of the date that Laurel Savings Bank's predecessor, Laurel Savings Association, first used the mark in good faith, 1982. *See Natural Footwear*, 760 F.2d at 1397.

### 1. Market Penetration

The degree of market penetration necessary to assign a user superior rights in a remote geographic market cannot be precisely defined. Four factors, however, are useful: 1) the volume of service; (2) positive and negative growth trends in the area; (3) actual customers in relation to potential customers; and (4) the amount of service advertising conducted in the area. *See id.* at 1398; *ACCU Personnel*, 846 F.Supp. at 1206. Using these four factors, the summary judgment submissions leave no genuine issue of material fact as to pre-consolidation Laurel Bank's significant inroads west of the three-county area of Blair, Cambria and Indiana, but ultimate failure to penetrate the area being serviced by Laurel Savings Association by 1982.[16]

---

14. I repeat that the "relevant market area" used herein will not be law of the case for purposes of crafting an appropriate remedy.

15. Laurel Bank has produced evidence that Laurel Savings Association learned of the existence of The Laurel National Bank after June 1982. Dkt. no. 54, Exh. M, at 7. By that time, Plaintiffs' mark had already been adopted and put into use. Although Laurel

Savings Association apparently knew of Laurel Bank in 1995 when the former altered its name to Laurel Savings Bank, dkt. no. 54, Exh. N, at 33–34, that fact is irrelevant for purposes of assessing its good faith in 1982.

16. Defendant Laurel Bank is not entitled to claim any market penetration, reputation or good will built up by the pre-consolidation branches of Fayette Bank or JBT. As Laurel

### a. Volume of Service in the Area

At its six branch offices, plaintiff Laurel Savings Bank currently offers a wide range of banking services to both individual and commercial customers. Laurel Savings Bank has approximately 35,000 customer accounts. Dkt. no. 40, Exh. 1, at 4. It lists assets as of 1997 at $211,987,000 and savings deposits at $175,019,000. *Id.*

The vast majority of Plaintiffs' customers reside in areas surrounding the six branch offices in Allegheny and Butler Counties. *Id.* at 12; *see also* Dkt. no. 42, Exhs. T, U, V, W, X. Laurel Savings Bank does, however, provide services to customers who live in the contiguous counties of Armstrong, Beaver, Washington, and Westmoreland. As of November 6, 1997, of the total accounts, 149 (savings and loan combined) were held by customers residing in Armstrong County, 84 in Beaver County, 90 in Washington County, and 145 in Westmoreland County. Dkt. no. 42, Exhs. T; Y, Z, AA, BB. These numbers indicate that Laurel Savings Bank has achieved significant market penetration in the relevant market area.

In contrast, Defendant Laurel Bank operated no branch offices or ATMs in the six-county area prior to the 1997 consolidation, much less before 1982. Dkt. 43, Exh. 5, at 1–4. Rather, it operated twelve branch offices in Blair, Cambria and Indiana Counties. Its marketing efforts at the time via newspaper, radio and television, while extensive, were concentrated in those same three counties. Nonetheless, affording the Defendants a favorable interpretation of their submissions, it appears that Laurel Bank had made some inroads into the six-county area by 1982.

Notably, according to its customer records, Laurel Bank had 47 accounts in the six-county area in 1974. By 1981, that number had grown to 265 accounts, although no breakdown of accounts by county is available. Dkt. no. 59, at 4–5; *see also* Dkt. no. 49, Exh. G; Dkt. no. 52, Exh.

H; Dkt. no. 55. In connection with these accounts, checks, deposit slips, ATM cards, correspondence and other documents bearing the "Laurel" mark were disseminated in the area.

At least nine of these accounts were commercial loans, two of them made in connection with Mellon Bank of Pittsburgh. Dkt. no. 52, Exh. H. At some unspecified date, the Mellon Bank Datacenter presented Laurel Bank with a plaque commemorating Laurel Bank's "loyalty and contributions over 25 years ... as a most valued partner." Dkt. no. 54, Exh. K. Had this plaque been presented at the latest in 1997, it would still evidence Mellon's familiarity and partnership with Laurel Bank dating back to 1972. Again, documents bearing the "Laurel" mark were disseminated in the area in connection with these activities.

Between 1986 and 1989, after its affiliation with BT Financial, Laurel Bank pursued a commercial lending campaign targeting businesses in the Pittsburgh area of Allegheny County. Dkt. nos. 55, 56. No print, radio or television advertising accompanied this campaign, but Laurel Bank's assistant vice-president made personal visits to about 50 businesses in Allegheny County, generating at least nine commercial loan accounts. Dkt. no. 56, at 1–2. Laurel Bank's commercial lending specialists met with referrals and distributed Laurel Bank business cards, institution information and financial statements. Once the loans were made, the Allegheny County recipient received statements, communications and promotional items bearing the "Laurel" mark. *Id.* at 2–3.

Since 1974, Laurel Bank has had a smattering of shareholders within the six-county area. Doc. no. 43, Exh. 5, at 8. For example, in 1974, there were 19 shareholders in Allegheny County, 1 in Beaver County and 9 in Washington County. *Id.* By 1982, there were 24 shareholders in Allegheny County, 7 in Armstrong County,

Bank was the entity actually using the mark,

only its activities are relevant.

2 in Beaver County, 13 in Washington County and 1 in Westmoreland County. *Id.* By 1995, there were 380 shareholders in the six-county area. *Id.* at 9. Shareholders were sent annual and quarterly reports plus other communications bearing the "Laurel" mark. *Id.* at 8.

After 1985, some of the JBT and Fayette Bank ATMs in the relevant market area sported a small sticker identifying Laurel Bank as a BT Financial affiliate. Dkt. no. 42, Exh. EE.

Whether the volume of service is significant "will vary with the [service] and the market." *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 473 (3d Cir.1990). Service volume must be more than de minimis to warrant protection. *Natural Footwear,* 760 F.2d at 1400 ("when sales activity does not exceed even a threshold level, a court may properly conclude that market penetration . . . simply has not been established"). Merely surpassing the de minimis threshold, however, does not automatically result in protection. *Jacquin,* 921 F.2d at 473.

In arguing that their service volume in the relevant area as of 1982 was not de minimis, Defendants rely upon *Dominion Bankshares.* In that case, the court granted an injunction sought by plaintiff Dominion Bankshares Corporation, a Virginia-based bank with no physical presence in Pennsylvania, prohibiting the Defendants from using, in connection with a proposed commercial bank, the mark "Dominion Bank" in the Delaware Valley and Devon areas of Eastern Pennsylvania. 690 F.Supp. at 340–341. Plaintiff Dominion Bankshares had 1,953 accounts worth approximately $114,000,000 with customers in the Delaware Valley and 13 accounts with customers in Devon. *Id.* at 341. At first glance, these 13 accounts in Devon would appear to establish only de minimis market penetration. Dominion Bankshares, however, had engaged in substantial advertising, much of which penetrated into the areas at issue. *Id.* Moreover, through its Pennsylvania affiliates, also named "Dominion Bank," Dominion Bankshares provided banking services and solicited VISA merchant and individual credit card accounts in the Delaware Valley and Devon. *Id.*

Laurel Bank's 265 accounts in the relevant geographical area are much greater in number than the mere 13 in *Dominion Bankshares.* These accounts would have generated many related documents and thus, exposure of the mark to Pittsburgh-area customers, as well as to the investment, banking and legal communities. Still, unlike Dominion Bankshares, Laurel Bank did not extensively advertise its services in the greater Pittsburgh metropolitan area prior to 1997, nor did it offer banking services through an affiliate under the same mark. Thus, its account holdings, while numerous, are not so voluminous as to suggest that Laurel Bank conducted a significant amount of financial service activity in the relevant area. Laurel Bank's lengthy partnership with Mellon Bank and the commercial loan drive conducted in the mid–1980's suggest some penetration into the Pittsburgh metropolitan area, but are insufficient to transform what really is de minimis service volume into something more significant.

That Laurel Bank had a smattering of shareholders continually exposed to the mark adds little to the analysis. Shareholder communications are not customer solicitations and accordingly are entitled to little weight in an assessment of market penetration. *See ACCU Personnel,* 846 F.Supp. at 1208 (temp agency advertisements to potential employees are not probative of market penetration because they cannot be considered client solicitation or promotion of services). Moreover, the number of shareholders is quite minimal in comparison to the size of the market.

Finally, the ATM fee notice sticker identifying Laurel Bank as an affiliate postdates 1982. At best, these stickers are inconspicuous and fail to enhance Defendants' market penetration.

### b. Positive and Negative Growth Trends in the Area

Plaintiff Laurel Savings Bank has experienced a moderate but steady rate of growth. In 1994, it had 32,052 accounts with $157,179,000 worth of savings deposits. By 1997, those numbers had reached 34,990 and $175,019,000, respectively.

Laurel Savings Bank claims to be "continuously exploring and looking at the possibility of acquiring and opening new offices," although no new acquisitions or offices have materialized. Dkt. no. 40, Exh. 1, at 24. In or around 1991, Plaintiffs submitted a bid to purchase an Atlantic Financial branch in Fox Chapel, Allegheny County. In 1996, Plaintiffs investigated the possible purchases of First Home Savings branches in Cranberry Township, Butler County and Natrona Heights, Allegheny County, as well as Bridgeville Savings in the South Hills of Allegheny County. *Id.* In 1997, Plaintiffs considered opening a new branch in Sarver, Butler County to serve a large number of already existing customers holding 6,057 accounts. Despite these plans, Laurel Savings Bank has operated at the same six branch offices as its predecessor since 1982.

Laurel Bank's current growth rate, by virtue of its affiliation with BT Financial, an entity worth over $1 billion, is strong and full of potential. Yet, I must assess its growth rate as of 1982. It appears that Laurel Bank's predecessor, the Laurel National Bank, had affirmatively considered westward expansion in the 1960's and '70's. It had engaged in discussions for possible mergers or acquisitions within Indiana, Westmoreland and Armstrong Counties and in 1970, acquired a bank in Indiana County. *See* Dkt. no. 50, Exh. D. Even so, affording the Defendants the benefit of all reasonable inferences drawn from the record, Laurel Bank had not actually expanded westward from Indiana County by 1982. *See* Dkt. no. 50, Exh. F (map of Laurel Bank branch offices in 1974, 1981, and 1985). Notably, no discussion or plans to acquire or build a branch office in Allegheny County ever occurred before 1985. Dkt. no. 45, Exh. 26, at 29–30. To repeat, the westward expansion of BT Financial's other affiliates, JBT and Fayette Bank, is irrelevant since Laurel Bank did not become an affiliate until 1985, and neither of these affiliates used the "Laurel" mark.

### c. Actual and Potential Customers

At the present time, plaintiff Laurel Savings Bank services over 35,000 accounts. Related checks, credit cards, and documents are distributed to individuals and businesses throughout the relevant market area. By 1982, defendant Laurel Bank had 265 accounts, a number which had grown to 502 by 1995. Dkt. no. 59. Neither party has documented the number of potential customers in either the six-county or the greater Pittsburgh metropolitan areas. *See* Dkt. no. 49, at 19 ("the number of potential customers in the six-county area is not known").

### d. Service Advertising

Since adopting the mark in 1982, Laurel Savings Association and now plaintiff Laurel Savings Bank have featured "Laurel" in their direct and indirect marketing efforts. Each of the six branch offices has been continuously posted with a large exterior sign bearing either the "Laurel Savings Association" or "Laurel Savings Bank" name. Dkt. no. 40, Exh. 1, at 8–9; Dkt. no. 42, Exh. K (signage photos). Many of these signs also sported the Plaintiffs' stylized "L" logo and green coloring. *Id.*

"Laurel" has appeared in some form on all materials provided to customers, including direct mailing, stationary, savings passbooks, checks, certificates of deposit, bank statements, and loan papers. *Id.* at 9; Dkt. no. 42, Exhs. L, N (promotional literature and customer items from Laurel Savings Association); Exhs. M, O (promotional literature and customer items from Laurel Savings Bank). In addition,

the "Laurel" name and logo has been exposed to individuals, businesses, and charitable organizations dealing with Laurel Savings Bank customers via "Laurel" embossed checks, ATM cards and credit cards. Dkt. no. 40, Exh. 1, at 12–13.

Promotional items, such as pens, calendars, date books, memo pads, key-chains, T-shirts, calculators and clocks, all bearing the "Laurel" mark, have been distributed by both Laurel Savings Association and Laurel Savings Bank through a variety of charitable and civic organizations and events since 1982. Dkt. no. 40, Exh. 1, at 9–11 (listing item and date distributed); Dkt. no. 42, Exh. P (photos of promotional items bearing the "Laurel" mark). Also, over the years, plaintiff Laurel has made charitable donations to a variety of Pittsburgh-area organizations including, to name a few, the Fire Chiefs Association of Allegheny County, Chiefs of Police Association of Allegheny County, Pittsburgh Three Rivers Regatta, and the Builders Association of Greater Pittsburgh. Dkt. no. 40, Exh. 1, at 8; Dkt. no. 41, Exh. H (charitable contribution invoices). These donations have frequently been acknowledged in some printed publication. Dkt. no. 40, Exh. 1, at 8.

In addition to customer and promotional items, both Laurel Savings Association and Laurel Savings Bank have advertised their services in connection with the "Laurel" name since its adoption in a variety of print media, ranging from regional newspapers with a broad readership base to local publications and newsletters distributed by churches, schools, chambers of commerce and civic organizations. Dkt. no. 40, Exh. 1, at 4–7. In particular, Plaintiffs have occasionally advertised under the Laurel mark in regional newspapers including the Pittsburgh Post–Gazette (1982–present, circulation primarily the Pittsburgh metropolitan area) and the former Pittsburgh Press (1982–93, similar circulation). Id. at 5 (also listing Pittsburgh–Tribune Review 1996 to present) and the Pittsburgh Business Times (1993–94, circulation primarily Allegheny County). Notably, the bulk of Plaintiffs' advertising in regional papers, however, appears to have been confined to legal notices and interest rate listings with occasional feature articles.

Advertising in local publications has included weekly promotions in the North Edition of The Green Sheet (1982–1992, Millvale, PA), the Pennysaver (1982–1991 in the North Hills, Southern Butler County and the Pittsburgh city center editions), and the Country Classified (1982–present, Cabot, Pa., direct mail and in-store distribution). Plaintiffs have occasionally advertised in the Valley News Dispatch (1982–present), a fairly large daily serving primarily the areas surrounding Laurel Savings Bank's branches, the North Hills News Record (1982–present, North Hills area); the Butler Eagle (1982–present, primarily Butler County), The Bulletin (1996–97, Pittsburgh neighborhoods of Bloomfield, Friendship, Garfield and East Liberty), and The Observer (1996–97, Pittsburgh metropolitan area). Dkt. no. 40, Exh. 1, at 5–6; Dkt. no. 40, Exh. B (samples of local print advertisements 1996–97); Exh. C (local print invoices 1987–95).

Finally, both Laurel Savings Association and Laurel Savings Bank have advertised in special promotional publications distributed by civic organizations, high schools and churches located within the vicinity of Plaintiffs' six branch offices. For example, ads bearing the "Laurel" mark have appeared in Rotary Club and Kiwanis programs, school sports programs for North Allegheny, Shaler Area, Peabody, Knoch and Hampton high schools, and church bulletins distributed by St. Joseph's Catholic Church (Cabot, Pa.), St. Mary's (Glenshaw, Pa.), St. Ursula (Allison Park, Pa.) and St. Raphael (Pittsburgh, Pa.). Dkt. no. 40, Exh. 1, at 7; Dkt. no. 40, Exh. E (samples of civic and school publications and related invoices); Exh. F (samples of church publications and related invoices). Both Laurel Savings Association and Laurel Savings Bank have had listings in the

Allegheny County and Greater Pittsburgh Area Yellow and White Page phone directories. Dkt. no. 40, Exh. 1, at 7.

From 1974 to 1982, Laurel Bank's service advertising was largely confined to Cambria, Indiana and Blair Counties. *See* Dkt. no. 45, Exh. 26, at 36–48. Ads were placed, for example, in the *Johnstown Tribune Democrat* (distribution in all of Cambria and Somerset Counties, part of Bedford, Blair and Indiana Counties); *Indiana Evening Post* (mainly Indiana, with some distribution into Armstrong and Westmoreland Counties); and *Mountaineer Herald* (mostly Cambria County, with parts of Somerset and Indiana Counties). Dkt. no. 43, Exh. 5, at 11–12. Laurel Bank erected billboards in Johnstown and advertised on various radio stations, including WFBG–AM (Altoona), WZGO–FM105.7 (Johnstown), WBXQ–FM 94 (Cresson) and WDAD–AM (Indiana). Dkt. no. 54, Exh. K. In addition, assuming distribution "before 1985" to also encompass distribution before 1982, Laurel Bank distributed customer promotional items such as matchbook covers, note pads, bags, coin banks, and plastic combs, all with the words "Laurel Bank" or the corresponding logo embossed thereon. *Id.*

From the time it acquired Laurel Bank in 1985 to the present, defendant BT Financial has advertised Laurel Bank in the Progress Edition of the *Greensburg Tribune Review* in Westmoreland County and on WJAC–TV, a television station which broadcasts primarily to the Johnstown viewing area, but with sufficient signal strength to penetrate airwaves in the six-county area. Dkt. no. 43, Exh. 5, at 9. Laurel Bank continued to distribute customer promotional items. Dkt. no. 54, Exh. K. BT Financial's other affiliate banks, however, did not typically feature Laurel Bank in their marketing materials beyond identifying it as an affiliate. Dkt. no. 45, Exh. 26, at 69–70.

While it engaged in substantial marketing and promotional efforts in the area of Cambria, Indiana and Blair Counties, pre-consolidation Laurel Bank did not make charitable donations, or sponsor seminars, high schools or sports teams in the relevant market area. Dkt. no. 45, Exh. 26, at 80–85. It placed no telephone listings, radio, television or billboard ads in Allegheny County, or the area surrounding metropolitan Pittsburgh. *Id.* at 43, 46.

### e. Additional Factor

In addition to arguments targeted at the traditional four factors for market penetration, each party also cites the other's definition of their respective market as outlined in annual federal Community Reinvestment Act ("CRA") statements. The Community Reinvestment Act, 12 U.S.C. § 2901, *et. seq.* requires lending institutions to advertise and make available mortgages for low and moderate income markets. *See Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 380 (7th Cir.1992). CRA statements are submitted so that the Federal Home Loan Bank Board can evaluate the institution's service.

In its CRAs, as did Laurel Savings Association, plaintiff Laurel Savings Bank has consistently defined its assessment area as that "surrounding our six (6) branch offices, located in Allegheny and Southern Butler Counties." Dkt. no. 42, Exh. CC; Dkt. no. 50, Exh. B. Defendant Laurel Bank's CRAs for 1992 through 1995 define its assessment area as that encompassing Cambria, Indiana and Blair counties. Dkt. no. 45, Exh. 23.

Both parties argue that the other should not be permitted to define its market more broadly than they have represented to the Federal Home Loan Bank Board. Defendants assert that Plaintiffs' CRA Statements reflect a market consistent with Laurel Savings Bank's self-proclaimed "community image" and a strategic plan developed by G & R Investment Consultants for growth in 1995–99, focusing on communities near the narrow Route 8 corridor. *See* Dkt. no. 58, Exh. C. Plaintiffs counter that Laurel Bank executives con-

firmed that the CRA-delineated area was the institution's actual market before 1997. Dkt. 45, Exh. 26, at 59–60.

CRA statements have a limited purpose. They define the institution's market for purposes of low-to-moderate-income loan customers, a subsection of potential business. Both parties' statements certainly reinforce what the other summary judgment evidence tends to support, that both Laurel Savings Bank and Laurel Bank primarily reach customers proximately located near their branch offices. In an assessment of market penetration for purposes of trademark law, however, neither can be bound simply to that area, since recognition of their mark travels via advertising, word of mouth, and remote use through ATMs and telephone service.

*f. Conclusion on the Market Penetration Factors*

Defendant Laurel Bank has failed to identify a genuine issue of material fact, and in addition, has failed to prove that it, and not Laurel Savings Bank, is the owner of the mark in the relevant market area under the theory of market penetration. As of 1982, the date of Laurel Savings Association's first good faith use, Laurel Bank had de minimis sales volume and a negligible number of actual customers. In addition, while it had contemplated and begun a gradual westward expansion, Laurel Bank had not yet opened any branch offices west of Indiana County, nor had it engaged in advertising sufficient to carry its mark into the greater Pittsburgh metropolitan area.

**2. Reputation**

■ Rights in a mark can extend beyond the geographic area of actual sales and customer residences if the user's reputation is carried via word of mouth and advertisements. When a senior user demonstrates that it has established a reputation beyond its own market area, reputation alone, without market penetration or physical presence, may afford it superior trademark rights in the remote market of the junior user. *See Holiday Inns v. B & B Corp.*, 409 F.2d 614 (3d Cir.1969); *see also* Gross, *supra*, at 1085–1087. A user can build up an "identifiable public image" with activities conducted solely within its own market, yet have that image travel to other markets. *Holiday Inns*, 409 F.2d at 615–616. Logically, if the senior user's reputation has extended into the junior user's territory, then the senior user has achieved market penetration sufficient to preclude good faith use by a junior user and it would be improper to characterize their respective markets as remote. *See* 4 *McCarthy on Trademarks* § 26:16.

■ In an era where customers bank through ATMs, over the telephone and on the Internet, the banking industry is no longer tied to neighborhood branches building up localized reputations and good will. *Cf. Holiday Inns*, 409 F.2d at 617 ("[w]ith the development of today's mobile society . . . there has been a corresponding diminution of older concepts that services are conducted in restricted or local marketing and trading areas"). By virtue of its activities and advertising, Laurel Bank has unquestionably gained a reputation extending beyond the border of its three-county market area and into the six-county area served by the Plaintiffs. Yet, this is clearly not a reputation comparable to the famous, federally registered, or nationwide marks at issue in cases like *Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir.1948) (world-famous, nationally advertised "Stork Club" mark), or *Caesars World Inc. v. Caesar's Palace*, 490 F.Supp. 818 (D.N.J.1980) (world famous, nationally advertised hotel mark), upon which Defendants rely.

Laurel Bank has never been the subject of extensive national or statewide advertising. *See* 4 *McCarthy on Trademarks* § 26:17. Moreover, despite the banking industry's technological strides, Laurel Bank's customers are simply not ambulatory in the same sense as hotel and restaurant patrons. *See id.* at 26–25 ("the pur-

chasing buyer class for services such as hotels, motels and restaurants are ambulatory ... [t]hey may carry the reputation of the mark thousands of miles away from the actual outlet"). For these reasons, I reject the Defendants' attempt to characterize its reputation as having infiltrated the Plaintiffs' market area by 1982 or by 1995 and find no genuine issue of material fact existing as to that theory.

### 3. Zone of Natural Expansion

Having failed to show that it had achieved market penetration or reputation in the relevant market area by 1982 or by 1995, defendant Laurel Bank may still have superior rights in the "Laurel" mark if, at the time the junior user adopted the mark, it did so in an area within Laurel Bank's "natural zone of expansion." The Court of Appeals for the Third Circuit has never explicitly adopted or rejected this theory, *see ACCU Personnel,* 846 F.Supp. at 1208, however, I will assume that it is valid for purposes of resolving these motions.

The natural zone of expansion theory affords the senior user "breathing space" within which to expand, and it is generally recognized that "if a senior user has constantly expanded its business by the date of the junior user's adoption of the mark, and if distances are not great, it may be that the senior user is entitled to exclusive rights in a zone of natural expansion which includes the junior user's area, even though no actual sales have yet been made in that area by the senior user." *ACCU Personnel (quoting* 2 *McCarthy on Trademarks* § 26:08[1], at 26–32 (3d ed.1992)). Courts, however, wary of applying what is a legal fiction, tend to define the area of natural expansion very narrowly. *See Tally–Ho,* 889 F.2d at 1027.

Considerations include: 1) the geographic distance from the senior user's actual location to the perimeter of the claimed zone; 2) the nature of the business and the size of the senior user's zones of market penetration and reputation; 3) the history of the senior user's expansion and assessment at to when the senior user could potentially reach the zone he claims; and 4) whether it would take a "great leap forward" for the senior user to enter the zone (*i.e.,* whether expansion into the claimed zone is the next logical step). *Tally–Ho,* 889 F.2d at 1028 (*citing McCarthy on Trademarks* § 26:9, at 304–305 (2d ed.1984)). *See also Popular Bank,* 9 F.Supp.2d at 1356 ("[g]eographical proximity is a significant factor"). The zone of natural expansion does not necessarily include all areas into which the senior user has actually expanded, since that use may infringe upon the junior user's legitimate, superior use. *Tally–Ho,* 889 F.2d at 1028.

Even when Defendant Laurel Bank's market area is characterized at its most narrow (*i.e.,* the three-county area), the parties still operate within 100 miles of each other within the same state. Thus, there is no substantial geographic distance involved here.

In 1982, although Laurel Bank had begun a creeping westward expansion, it had not yet become an affiliate of BT Financial, an institution with approximately $1 billion worth of assets. Nor, as discussed above, had it reached far beyond the confines of the three-county area by virtue of sales, advertising or reputation. By that time, Laurel National Bank extended only as far west as its branch office in Clymer, Indiana County. Although Laurel National Bank had considered potential acquisitions in Westmoreland and Armstrong Counties, it never followed through with any of these plans. Thus, while it might not have been a leap for Laurel National Bank to expand into the eastern perimeters of Armstrong and even Westmoreland Counties, it would certainly have been a leap to extend into the greater Pittsburgh metropolitan area loosely used here to define the relevant market.[17]

17. Circumstances have certainly changed for

Laurel Bank since 1982, having been ac-

## C. Likelihood of Confusion

 As the owner of the "Laurel" mark in the relevant market area, Plaintiff Laurel Savings Bank must also show that the Defendants' conduct will cause a likelihood of confusion. *Ford Motor Co.,* 930 F.2d at 291. *See also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 205 (3d Cir.1999) ("the [ ] standard for determining trademark infringement under the Lanham Act is the likelihood of confusion[ ]," not "possibility of confusion"). "The confusion that trademark law seeks to prevent is confusion as to the source of the goods." *A & H Sportswear,* 166 F.3d at 202. Where the parties deal in competing goods or services, "the court need rarely look beyond the mark itself." *Id.* (*quoting Interpace,* 721 F.2d at 462). Actual confusion is one of the most reliable indications of the likelihood of confusion, so long as the confusion is causally related to the use of similar marks. *Dominion Bankshares Corp.,* 690 F.Supp. at 347; *Horizon Financial,* 2 U.S.P.Q.2d at 1703; *see also* 3 *McCarthy on Trademarks* § 23:13.

 The likelihood of confusion may be reduced if the customer is reasonably expected to use a high level of care and attention in choosing a product or service. *See Versa Products Co. v. Bifold Co.,* 50 F.3d 189, 204 (3d Cir.1995). "Ordinarily, one would expect bank customers to be prudent in seeking out and using the services of a[ ] bank[,]" *Horizon Financial,* 2 U.S.P.Q.2d at 1703, inasmuch as people are typically not cavalier about the safeguarding of their money. However, in cases where "the services, marketing channels, and operative names are identical and the marks are very similar the factor of customer attention or care correspondingly becomes less important." *Id.*

 Many considerations converge to suggest that a strong likelihood of confusion exists here. First, both parties use the "Laurel" mark as the dominant portion of their names and as a shorthand reference to their services on documents, promotional materials and advertising. Where the mark is strong and distinctive, it is more likely that customers will be confused. *Versa Products,* 50 F.3d at 203. As outlined above, "Laurel" is a distinctive, arbitrary mark.

Second, the closer the relationship between the parties' services and the more similar their sales contexts, the greater the likelihood of confusion. *Interpace,* 721 F.2d 460. Here, while not all of their services overlap, Laurel Savings Bank and Laurel Bank clearly compete for banking customers among the general public and in the business community. They also tend to employ the same type of advertising and promotional media. In all likelihood, once defendant BT Financial renamed its Pitts-

quired in 1985 by BT Financial, a holding company with a proven track record of aggressive, westward expansion reaching into the relevant market area with its JBT and Fayette Bank affiliates. BT Financial has advertised Laurel Bank in and around Westmoreland County since roughly 1985, via newspaper, TV and billboards. In addition, Laurel Bank has added two branch offices in Indiana County proximate to the Armstrong County border, dkt. no. 50, Exh. F, and has advertised since 1985 in newspapers, such as the *Indiana Evening Gazette,* which reach portions of Armstrong County. Dkt. no. 43, Exh. 5, at 11. Laurel Bank claims that its eventual consolidation with JBT and Fayette Bank, and entry into the relevant market area was a "specifically predictable event in an era of rapid consolidation within the banking indus-

try" for BT Financial affiliates. Dkt. no. 49, at 16.

Were I defining it as of 1997, I would probably conclude that no reasonable fact finder could fail to find that Laurel Bank's natural zone of expansion extends at least to the perimeter of the greater Pittsburgh metropolitan area. In addition to pre-consolidation Laurel Bank's own history of westward expansion, it now has the resources to push 50 miles beyond Armstrong and Westmoreland Counties into the relevant market area. As the area used for purposes of resolving these competing summary judgment motions will not be law of the case, Laurel Bank's altered circumstances and BT Financial's aggressive growth strategy will be considered in crafting an appropriate remedy.

burgh area branches, it would have advertised Laurel Bank in many of the same publications used by the Plaintiffs. Also, for these reasons, the fact that customers are ordinarily careful about banking services is rendered much less important.

Third, because it is permissible to focus simply on "Laurel" as the dominant portion of parties' marks, *see* 3 *McCarthy on Trademarks* § 23:42, it is readily apparent that they are identical and require no protracted analysis of "sound, sight and meaning." *Id.* at § 23:21 (*citing* Restatement (Third) of Unfair Competition § 21(a) (1995)). In addition, both parties use a green coloring scheme and similar stylized "L" logo for marketing purposes. *See Horizon Financial*, 2 U.S.P.Q.2d at 1702 . (even though color scheme differed, because both marks featured "Horizon," the appearance, sound and meaning of the marks was strikingly similar).

Most importantly, plaintiff Laurel Savings Bank has documented over 170 incidents of actual confusion since the Defendants' October 1997 consolidation, despite the fact that this litigation prevented Defendants' from changing the signage at existing JBT and Fayette Bank branches and advertising the new name.[18] Even without a directive to document such incidents, defendant Laurel Bank employees have identified at least an additional 21 misdirected inquiries. Dkt. no. 45, Exh. 21. This confusion has taken many forms, including misdirected inquires for account balances, deposit information, tracking numbers, service charges, stop payments, loan payoff options and fund transfers to BT Financial accounts. As such mistakes have been documented at every Laurel Savings Bank branch, it appears that the confusion is widespread. *See* Dkt. no. 44, Exhs. 20–21.

In addition, there have been at least 20 instances where BT Financial affiliate customers have tried to cash in mature CDS or checks drawn on BT Financial affiliate accounts at Plaintiffs' branch offices, 10 instances where BT customers have tried to pay on BT Financial affiliate-issued loans, and over 25 telephone inquiries to Laurel Savings Bank seeking directions to or telephone numbers for BT Financial affiliate branch offices. Dkt. no. 44, Exh. 20 (declarations of Laurel Savings Bank employees). According to the Plaintiffs, both institutions have also received numerous inquiries regarding what customers mistakenly believe to be the parties' affiliation, relationship or merger.[19] *See* Dkt. 44, Exhs. 20, 21.

Instead of opposing Plaintiffs' evidence on this prong of the infringement claim, *see* Dkt. no. 49, at 14 (Defendants assume "Laurel Bank" and "Laurel Savings Bank" are confusingly similar and likely to cause confusion), Defendants argue that the Plaintiffs, by changing Laurel Savings Association to Laurel Savings Bank in 1995, created the confusion of which they complain. Defendants point to *Jefferson Bankshares*, in which the parties were able to manage confusion arising from the simultaneous use of the marks "Jefferson National Bank" and "Jefferson Savings and Loan Association," *see* 1989 WL 222446 at *9, and suggest that the real source of confusion is the combination of "Laurel" with "Bank." That fact pattern, however, does not represent this case. Defendants moved into Laurel Savings Bank's market area after the Plaintiffs changed from "Association" to "Bank."

---

**18.** This evidence does not constitute inadmissable hearsay. *See Popular Bank,* 9 F.Supp.2d at 1360–62.

**19.** Evidence of bad faith on the part of the infringing user can support a greater likelihood of confusion. *See American Home Products, Corp. v. Barr Laboratories,* 834 F.2d 368, 371 (3d Cir.1987). I note in this respect that

Defendants had notice of Plaintiffs' use in the Pittsburgh area as early as May 1997 but chose the "Laurel" mark without any investigation of Plaintiffs' business. *See First Nationwide Bank,* 682 F.Supp. at 977 (bad faith may be found where defendants proceeded to use the infringing mark despite knowledge of the plaintiff's objections to their use).

Moreover, "Laurel," as an arbitrary mark, differs in kind from "Jefferson" which the *Jefferson Bankshares* court held to be a weak, descriptive mark when used in Virginia. *Id.* at \*8. The actual confusion already documented is not merely "exacerbated by Laurel Bank's use of its name and mark in the six-county area," dkt. no. 58, at 3, it is caused by the Defendants' entry into the relevant geographic market. A reasonable fact finder could not fail to find a likelihood of confusion on this record.[20]

## IV. CONCLUSION

For the foregoing reasons, I will grant the Plaintiffs' motion for partial summary judgment on its trademark infringement action under the Lanham Act and deny the Defendants' competing motion. I will address the appropriate remedy for Defendants' infringing use of the "Laurel" mark as a separate phase in this litigation, noting again that the relevant market area used to resolve these motions shall not be law of the case. An appropriate order follows.

## *ORDER*

AND NOW, this _____ day of April 1999, upon consideration of Plaintiffs' motion for partial summary judgment, dkt. no. 38, Defendants' motion for summary judgment, dkt. no. 48, and the parties' arguments relative thereto, it is hereby ORDERED and DIRECTED that:

1. Plaintiffs' motion for partial summary judgment, dkt. no. 38, is GRANTED;

2. Defendants' motion for summary judgment, dkt. no. 48, is DENIED;

3. the relevant market area used herein for purposes of resolving the aforesaid motions shall not constitute the law of the

case for purposes of crafting the appropriate remedy;

4. a case management conference to consider, *inter alia,* what further proceedings are appropriate for crafting a remedy for Defendants' infringing use of the mark shall be held on *Tuesday, June 8, 1999, at 10:00 A.M.,* 319 Washington Street, Room 104, Johnstown, Pennsylvania.

---

**20.** Likelihood of confusion is typically a fact question, but it can, like any other such question, be resolved on summary judgment if the factual record has been adequately developed. *See CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1527 (1st Cir.1996); *Swisher Mower & Machine Co. Inc v. Haban Manufacturing Inc.,* 931 F.Supp. 645, 653 (W.D.Mo.1996).